[No. B048085. Second Dist., Div. One. Nov. 30, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MILOS KLVANA, Defendant and Appellant.

[No. B065578. Second Dist., Div. One. Nov. 30, 1992.]

In re MILOS KLVANA on Habeas Corpus.

#### COUNSEL

Bruce Daniel Rosen, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Marc E. Turchin and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

#### OPINION

ARANDA, J.*—Milos Klvana, a licensed doctor who practiced obstetrics, appeals from the judgment entered following a jury trial in which he was

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.

convicted of nine counts of second degree murder (Pen. Code,[1] § 187, subd. (a)), five counts of aiding and abetting the practice of medicine without a license (Bus. & Prof. Code, § 2053), one count of conspiracy to practice medicine without a license (§ 182/Bus. & Prof., § 2053), nineteen counts of preparing a fraudulent insurance claim (Ins. Code, § 556, subd. (a)(3)), ten counts of presenting a false insurance claim (Ins. Code, § 556, subd. (a)(1)), two counts of grand theft (§ 487, subd. (1)), and two counts of perjury (§ 118).[2] Klvana has also filed a petition for a writ of habeas corpus. (B065578.) We affirm the judgment and deny the petition.

BACKGROUND[3]

Viewed in accordance with the usual rules on appeal (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), the evidence presented at trial established that Klvana attended medical school in Czechoslovakia and obtained a degree in 1967. He began a four-year residency at Downstate Medical Center (Downstate) in New York on July 1, 1972. In 1975, while a third year resident, Klvana took the Council on Resident Education in Obstetrics and Gynecology (CREOG) examination; he performed poorly on this examination.[4] Klvana's deficient medical judgment, including one incident where he administered labor-inducing medication

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

[2] Dolores Doyle, a certified nurse assistant who worked with Klvana, was charged with three counts of murder, three alternative counts of involuntary manslaughter, five counts of practicing medicine without a license, one count of conspiracy to practice medicine without a license, seventeen counts of preparing a fraudulent insurance claim, nine counts of presenting a false insurance claim, and one count of grand theft.

Doyle initially pleaded not guilty to these charges but, after the trial started, entered a plea bargain under which she pleaded guilty to three counts of involuntary manslaughter, five counts of practicing medicine without a license, one count of conspiracy, and seven counts of insurance fraud. The remaining counts against her were dismissed.

[3] Inasmuch as Klvana's appellate challenge is limited to the convictions for second degree murder and sentencing issues, we shall limit our factual discussion to those counts. As an overview, the second degree murder counts were based on the following deaths (listed by the mother's surname):

| Count | Death | Date of Death |
| --- | --- | --- |
| 1 | Johnson | 12/25/82 |
| 2 | Fava | 8/25/83 |
| 3 | James | 10/12/83 |
| 4 | Ginsberg | 1/17/84 |
| 8 | Diederick | 2/7/84 |
| 20 | Ennis | 5/26/84 |
| 23 | Friel | 8/31/84 |
| 25 | Palacios | 3/1/85 |
| 31 | La Verne | 9/15/86 |

[4] The CREOG examination consists of a multiple-choice portion and a patient management problem section. Of the first year residents who took the examination, 67 percent scored higher than Klvana on the multiple-choice section and 63 percent scored higher on the patient

(Pitocin)[5] to a woman whose pelvis was inadequate to permit a safe vaginal delivery, precluded him from becoming chief resident, and he resigned from Downstate without completing his fourth year of residency. Klvana was informed that he was ineligible to take the board certification examination for obstetrics since he failed to become chief resident.

On June 2, 1975, Klvana applied for a California medical license, which was granted on October 31, 1975. In January 1976, Klvana was accepted into a two-year anesthesiology residency at Loma Linda University Hospital (Loma Linda). According to Dr. Bernard Brandstater, chief of Loma Linda's anesthesia department, although Klvana performed well during his first three months, Klvana then began to study less energetically and became less devoted to the details of patient care in the operating room, sometimes exhibiting indifference to patient safety. Dr. Brandstater counseled Klvana on this subject many times. Dr. Floyd Brauer, another physician at Loma Linda, expressed his concerns to Klvana regarding Klvana being "cavalier and casual in his approach to his duties, not performing them in a manner that really would indicate the utmost care for his patients."

In late 1976, Loma Linda's reviewing faculty concluded that Klvana was responsible for a patient's death due to his failure to closely monitor the effects of drugs administered and detect early signs of depression and inadequate breathing which resulted in cardiac arrest. Klvana was informed that the reviewing faculty considered his "tendencies and attitudes and incompetencies, which [they] felt disqualified him [from] continu[ing] in a care in anesthesiology." It was recommended that he avoid fields of medicine "involv[ing] situations where patient's safety on a moment-to-moment basis is at issue," and that he voluntarily withdraw from Loma Linda's program since he would not be reappointed. Klvana resigned on December 16, 1976.

Klvana applied for privileges at Granada Hills Hospital (Granada Hills). His application, which indicated that he was board eligible in obstetrics and gynecology, was granted on May 24, 1977. Klvana's applications for reappointment were granted in 1982 and 1983. On July 19, 1983, Granada Hills informed Klvana of its concerns that an unusually high number of premature babies were being delivered by Cesarean sections, some of Klvana's cases were improperly managed, and the nurses were having difficulty reaching him. Thereafter, Granada Hills required Klvana to obtain a second opinion on all elective cases and have all cases proctored by another physician. On October 10, 1983, Granada Hills sent Klvana a letter which indicated that an

---

management section. Of the third year residents, 91 percent scored higher on the multiple-choice portion, and 76 percent scored higher on the patient management section.

[5]Pitocin is Parke-Davis's brand name for oxytocin.

ad hoc committee was scheduling a meeting to review his cases. Although this meeting took place, no conclusion was reached on the propriety of Klvana's actions because Klvana resigned his privileges just prior to the meeting.

Between 1977 and 1982, a pattern emerged where Klvana applied for privileges at various hospitals,[6] many times failing to disclose his Loma Linda residency or his probationary status,[7] and misrepresenting his board eligibility.

On December 20, 1980, Klvana purchased the Diet-Rite Medical Clinic (Diet-Rite). In an April 1983 application for a community care clinic license, Klvana indicated the clinic would engage in deliveries of "no risk pregnancies" despite the fact that such a license does not permit the delivery of babies. The clinic had been advised that deliveries were not permitted. On May 2, 1984, the Los Angeles County Department of Health Services issued a cease and desist order prohibiting the clinic from delivering babies.

By letter dated February 7, 1985, East Los Angeles revoked Klvana's privileges due to his performance in a tubal ligation procedure. Klvana was subsequently informed that his privileges were being removed and, in a form provided to both Klvana and the state, East Los Angeles indicated this action was due to care below hospital standards, one instance of misdiagnosis of a perforated uterus, failure to comply with the mandates of the February 7, 1985 letter revoking his privileges, and failure to invoke his administrative appeal rights.

*The Johnson Death*

When Kathleen Johnson became pregnant in 1982, she sought a physician who would agree to a vaginal delivery because she had been displeased with the manner in which a previous Cesarean section delivery had been handled. Johnson responded to Klvana's advertisement in the Yellow Pages. Klvana did not inform Johnson of any risks associated with a vaginal delivery following two Cesarean section deliveries. Johnson was assigned a December 10, 1982, due date. Klvana told Johnson she could deliver at Northridge.

---

[6]Klvana applied for privileges at Northridge Hospital (Northridge), Henry Mayo Hospital (Henry Mayo), Hollywood Presbyterian Hospital (Hollywood Presbyterian), Valley Vista Hospital (Valley Vista) and East Los Angeles Doctors Hospital (East Los Angeles).

[7]On March 14, 1980, following Klvana's misdemeanor conviction of 26 counts of prescribing controlled substances without a good faith examination, Klvana's license was placed on probation for 5 years by the Board of Medical Quality Assurance (BMQA). In his applications for privileges at Hollywood Presbyterian and Valley Vista, and for permission to supervise a physician's assistant, filed with the California Physician's Assistant Examination Committee, Klvana misrepresented that his medical license had never been limited, suspended, revoked or otherwise disciplined.

· When Johnson asked a Northridge alternative birthing center class instructor whether the center was available to a person who had previously delivered by Cesarean section, she was informed it was against Northridge's policy. Klvana suggested Johnson evade the policy by not informing Northridge that she had two previous Cesarean section deliveries.

Approximately two months prior to Johnson's delivery date, Klvana informed Johnson that he was preparing a room in his office as a birthing room since "he was concerned about [Johnson trying to] have a natural birth . . . [at Northridge] because of the influence and pressure of all the other practitioners in the hospital that felt it might not be that safe, and that they might be more than likely to intervene sooner to do another Cesarean [section delivery]." Klvana told Johnson she would be taken to Henry Mayo if an emergency arose but did not inform her that he no longer had privileges at that hospital.[8]

---

[8]Klvana's hospital privilege history is as follows:

Granada Hills
 Applied: November 1976
 Granted: May 24, 1977
 Reappointed: 1982 and 1983
 Resigned: October 18, 1983

Northridge
 Provisional: February 14, 1977
 Associate: November 28, 1978
 Provisional reappointment granted: March 19, 1979
 Reapplication granted: November 28, 1979
 Reapplication granted: August 1981
 Resigned: January 31, 1983

Henry Mayo
 Applied: April 25, 1977
 Granted: September 19, 1977
 Revoked: December 18, 1980
 Reapplication: August 21, 1981
 Delivered baby without privileges: October 9, 1981
 Application denied: February 11, 1982
 Reapplication: May 10, 1983 (denied)

Hollywood Presbyterian
 Applied: March 17, 1980
 No action taken due to BMQA probation

Valley Vista
 Temporary admitting/clinical privileges: January 15, 1982
 Applied: February 20, 1982
 Denied: April 22, 1982
 Temporary admitting/clinical privileges suspended: May 7, 1982

East Los Angeles
 Applied: May 31, 1982
 Granted: June 16, 1982
 Letter re unacceptable quality: April 18, 1984
 Letter re ineffectual tubal ligation/privileges revoked: February 7, 1985

Although Johnson had passed her anticipated due date when she visited Klvana's office on December 14, 1982, he did not perform a nonstress test. On December 20, 1982, Klvana told Johnson that he had miscalculated her due date and not to worry about not yet delivering.

Johnson began labor on December 23, 1982, and went to Klvana's office. After declining Klvana's suggestion that she have her membranes ruptured in order to speed delivery, Johnson was sent home with instructions to call when her labor progressed.

Johnson returned to Klvana's office the next morning. When Klvana determined that Johnson was only dilated three centimeters, he suggested that she be given Pitocin to speed labor. Johnson consented after being told by Klvana that failure to progress sometimes results in a Cesarean section delivery. Klvana did not use an infusion pump or electronic fetal monitor when he administered the Pitocin. Rather, for the one and one-half hours that Pitocin was administered to Johnson intravenously, Klvana had Johnson's husband hold the bag of solution in the air. Johnson had intense contractions immediately. Klvana occasionally checked the fetus's heart rate but took Johnson's blood pressure and pulse only once. Klvana neither adjusted the infusion rate of the Pitocin nor mentioned any possible complications which could injure the fetus.

After the delivery of a baby girl, in response to Johnson's concern that her baby did not seem responsive, Klvana stated that the baby was breathing normally. Klvana indicated the Johnson baby was fine and did not make an appointment for the baby to see a pediatrician the following day.

Later that night, the baby girl cried and refused to eat. The following morning, she developed seizures and labored breathing. Attempts to reach Klvana finally were successful that evening. Klvana suggested the problem was low blood sugar and that "it was probably better [for the baby] not to go to the hospital because [hospitalization] would probably result in unnecessary intervention." Klvana recommended that the baby be given sugar water, which the baby refused. The baby's breathing continued to be labored until she stopped breathing. A neighbor administered cardiopulmonary resuscitation (CPR) while paramedics were summoned; the baby did not respond. The paramedics took the baby to a hospital, where she was pronounced dead.

An autopsy determined that the baby girl's cause of death was respiratory distress syndrome and hyaline membrane disease. A reexamination by the

Revoked: February 27, 1985
Letter re below standard of care: March 19, 1985
Removed from medical staff: April 10, 1985

same pathologist led to the cause of death being changed to a respiratory problem. A pediatric pathology expert subsequently concluded that perinatal asphyxia was the most likely cause of death.

*The Fava Death*

Joanne Fava became pregnant in 1983 and visited Klvana's office in March of that year. Klvana estimated a due date between August 10 and 25, 1983. On June 17, 1983, Klvana told Fava she needed to gain weight because the fetus was tiny. On her July 8, 1983, visit, Fava had lost a pound, which did not concern Klvana. He told Fava not to gain any more weight or the fetus would become too large.

On August 24, 1983, after Fava's water broke, Fava and her family met Klvana at his office. After examining Fava, Klvana indicated she was not ready to deliver and stated that she should return home. Later that evening, Fava's contractions grew stronger and she and her family returned to Klvana's office. Klvana examined Fava while one of Fava's relatives (who worked for Klvana) monitored the fetus's heartbeat with a stethoscope. After several hours, Fava repeatedly requested Klvana to perform a Cesarean section delivery. Klvana said it would take up to two hours to set up the surgery, and he would instead induce labor. Klvana administered a drug intravenously and sometime later added something to the intravenous line which he indicated was to induce labor. Fava's relative informed Klvana that the fetus's heartbeat was very faint. Despite the difficult delivery and the fetus's growing weakness, Klvana did not send Fava to a hospital. Klvana examined Fava, removed the intravenous line, told Fava's mother that the fetus had died and that a Cesarean section delivery would endanger Fava's life. Several hours later, Klvana informed Fava of the fetus's death and, along with Fava's family members, pushed on Fava's abdomen; the dead body of a six-pound, thirteen-ounce fetus was delivered. Klvana indicated that the fetus had died three hours earlier because it was tired from pushing.

In June 1985, when Fava asked Klvana for birth and death certificates, Klvana indicated that he was being investigated and did not prepare either document. Klvana requested that Fava not tell anyone that she gave birth.

*The James Death*

In August 1983, when Julie James began seeing Klvana at his Newhall office, she asked whether he had fetal monitors and emergency equipment. He responded that "he had everything he needed and everything would be fine," and that he would take her to Henry Mayo or Granada Hills if she required a Cesarean section delivery.

When James visited Klvana's office on October 10, 1983, she was dilated three or four centimeters. Klvana administered Pitocin and James began to have harder contractions. James was never connected to an electronic fetal monitor. Klvana moved James, who was still receiving Pitocin, to the waiting room so that he could attend to another patient in the birthing room. When Klvana was through with the other patient, he stopped administering Pitocin to James and told her to return to the office the following day.

When James returned, the receptionist told her that Klvana was too busy with other patients to attempt to induce labor. Later, when Klvana examined James she was dilated four centimeters and he broke her water. He told her she would begin labor within 48 hours, gave her his telephone number, and told her to call him when she again went into labor.

At 2 p.m. that afternoon the contractions were 15 to 20 minutes apart, and James called Klvana. Pursuant to his instructions, she called back when the contractions were five, four, and three minutes apart.

Klvana met James at his office at 8:30 a.m. the next morning. James was dilated nine centimeters. Klvana administered Pitocin, and indicated that James's contractions were neither strong enough nor close enough for an imminent birth. At approximately 11 a.m., Klvana and the baby's father began physically pushing on James's abdomen. James was still receiving Pitocin. The fetus's heartbeat was not being monitored. During the last hour of James's labor, Klvana monitored the fetus's heart rate with a stethoscope.

Upon delivery of a baby girl, Klvana took the baby to a small bathtub, flushed her with water, and massaged her chest. He left the room with the baby, leaving James, who was bleeding heavily, on the bed. Klvana returned and indicated that CPR was being administered to the baby. Klvana left the room and, when he returned, indicated the baby had died and that he had done all he could to save her. Klvana made two injections into James's uterus, telling her that they would stop the bleeding, but this was not successful.[9]

James inquired about an autopsy and was told by Klvana that an autopsy would cost $1,500. Klvana recommended that James bury the baby in her backyard, not tell anyone about the death, and take a vacation to Hawaii.

An autopsy was conducted, which found "an extensive hemorrhage caput succedaneum" (swelling and bleeding under the scalp) and concluded the cause of death was "due to peripartum maternal anoxia of undetermined

---

[9]James continued to bleed for six weeks.

natural causes" (a lack of oxygen at the time of birth). The autopsy revealed no evidence of hypoplasia of the lung, the cause of death listed by Klvana on the death certificate.

James filed a medical malpractice action against Klvana. During the trial of the civil action, Klvana testified that "obstetrics is a risky business," he performs only low risk deliveries, he used fetal monitoring throughout his training, and, "[i]f [babies] are high risk, they don't deliver in the clinic. They go to the hospital." The $800,000 judgment against Klvana in that case was never satisfied.

On September 20, 1984, when Klvana discussed the details of the James delivery with a BMQA investigator, he indicated that he did not have Pitocin in his office. However, during a subsequent search of Klvana's office, four ampules and forty-four vials of Pitocin were discovered.

*The Ginsberg Deaths*

Mira Ginsberg first saw Klvana on May 25, 1982. At this meeting, she informed Klvana that she was Rh-negative and that her husband was Rh-positive. In response to Klvana's question, Ginsberg replied that she had been given Rhogam shots during an earlier pregnancy. Klvana told Ginsberg that he had privileges at Henry Mayo and Northridge but did not inform her that Henry Mayo revoked his privileges in 1980 and that his reapplication had been denied in February 1982. Ginsberg's due date was estimated to be December 5, 1982.

Klvana referred Ginsberg to Linda Pellegrin, who could serve as a labor-sitter. Ginsberg was aware Pellegrin was neither a registered nurse nor a licensed midwife, but had five years of experience delivering babies.

Ginsberg summoned Klvana on November 8, 1982, when her water broke. There was meconium[10] in the water. Klvana told Ginsberg she could go to the emergency room, to his office, or stay at home while waiting for her labor to begin, and gave Ginsberg's husband Pellegrin's telephone number. Pellegrin was summoned that afternoon. When she arrived, she monitored the fetus's heart with a stethoscope, examined Ginsberg, found meconium, and called Klvana. Klvana neither indicated that this was an urgent matter nor suggested administration of a nonstress test. He did not go to the Ginsberg household.

On the morning of November 9, following the onset of contractions, Klvana spoke to Ginsberg on the telephone but did not mention the possible

---

[10]Meconium is the fetus's first excrement. Its presence is a symptom of fetal distress.

problems with delivery. Pellegrin arrived at the Ginsberg house, checked Ginsberg's dilation, determined Ginsberg was not ready for delivery, and left.

At approximately 7 p.m., Ginsberg's contractions resumed and Pellegrin was summoned. The baby was delivered in meconium at 10 p.m. by Pellegrin. When Klvana was notified of the delivery, he said he was performing a Cesarean section delivery at Northridge. He neither attended the delivery nor went to the Ginsberg house.

Within 40 minutes of delivery, the baby grew pale and developed respiratory problems. Pellegrin called Klvana, who said he was too tired to come to the house and was going home to sleep. Klvana recommended Pellegrin administer oxygen, but Pellegrin had forgotten to bring her oxygen tank. Ginsberg's husband borrowed an oxygen tank from Dr. Lucille Schober, but the tank turned out to be empty.

Pellegrin called Dr. Gilbert Solomon at 11:30 p.m., described her efforts and the baby's Apgar scores and respiratory rate, and held the baby to the telephone so that Dr. Solomon could hear her breathing. Dr. Solomon instructed Pellegrin to bring the baby to Northridge's emergency room.

The baby stopped breathing and CPR was unsuccessful. Paramedics were summoned and they administered oxygen on the way to Simi Valley Adventist Hospital (Simi Valley). When they arrived at the hospital at 12:27 a.m. on November 10, there was no heartbeat or pulse. The baby was intubated and given medication intravenously, but never resumed breathing. She was pronounced dead 36 minutes later. There was evidence of meconium staining in the baby's trachea. Ginsberg was advised by Simi Valley that the cause of death was sudden infant death syndrome.

Dr. Solomon testified that the failure to appropriately suction the baby resulted in meconium aspiration. Had Ginsberg been hospitalized when her water broke and meconium was detected, her baby would have had a much better chance of survival.

Dr. Solomon requested a meeting with Klvana on January 10, 1983. At this meeting, Dr. Solomon advised Klvana that his practice was endangering patients. He told Klvana that the advice given in the Ginsberg case was below the standard of care and that he had reported Klvana to BMQA.

Klvana requested that Dr. Solomon delay filing a report with BMQA until after Klvana had a hearing with regard to a previous matter.[11]

Ginsberg again became pregnant in 1983 and consulted Klvana. Even though Klvana was made aware by the earlier pregnancy of high risk factors caused by the Rh factors, he made no arrangements for a backup hospital. He told Ginsberg that Northridge could be used in an emergency, even though he no longer had privileges there since he had resigned January 31, 1983. Despite the Rh factors, Klvana never performed an ultrasound examination. When Ginsberg went into labor at Klvana's office on January 16, 1984, he detected no fetal heartbeat.

The following day, Ginsberg felt mild contractions and returned to Klvana's office. The fetus was delivered stillborn; meconium was present in the amniotic fluid.

Klvana indicated he would "take care" of the fetus "to spare [the Ginsbergs] of the cost and emotional upset of an autopsy." However, Klvana merely wrapped the fetus in paper, placed it in a plastic bag, and left it in the hallway with the trash.

*The Diederick Death*

On June 29, 1983, Lanna Diederick visited Klvana's Temple City office and informed him that she was willing to be hospitalized if necessary and that she had previously experienced kidney problems. Klvana indicated that her kidney complications were not an impediment to a home delivery. Klvana gave Diederick a January 24, 1984, due date.

A November 9, 1983, ultrasound examination revealed that the fetus was a large boy in the breech position. Klvana did not indicate that he found fetal distress at the 36th week.

When labor began at 2 a.m. on January 30, 1984, Diederick called Doyle, who told her she was experiencing "false labor" and to call back if the contractions continued. Diederick and her husband called Doyle several times. Doyle arrived at 10 a.m. After performing a pelvic examination, Doyle determined Diederick was dilated five centimeters. Diederick asked Doyle to have Klvana deliver the baby via Cesarean section, but Doyle was unsuccessful in her attempts to contact Klvana.

By 3:30 p.m., Diederick was dilated eight centimeters. At 4:45 p.m., Doyle had Klvana phone in a prescription for oxygen. Diederick's husband

---

[11]Klvana was not charged with the November 10, 1982, death. It is presented here merely as background information.

decided Diederick needed to go to a hospital. Doyle contacted Klvana at 7:15 p.m. Klvana indicated Diederick needed a Cesarean section delivery, but Doyle assured her to the contrary. Doyle convinced Diederick to go to Klvana's Temple City office by telling her that no hospital would accept her unless she had a doctor to deliver the baby. Klvana arrived at the office at 9:40 p.m., performed a pelvic examination, and discovered that Diederick was now dilated only five centimeters. Despite the protracted labor of some 20 hours, rather than have Diederick undergo a Cesarean section delivery, Klvana administered Pitocin to her intravenously. No one monitored the fetus's heartbeat during the administration of the Pitocin.

A nine-pound, two-ounce baby boy was delivered at 11 p.m. The baby was dark blue and had an elongated head. Klvana placed the baby into a tub of ice water, and administered oxygen. When asked by Diederick why a hospital had not been called, Klvana responded that "they would have killed [the baby] because they would have put him on a respirator and caused pneumonia and caused him to die."

Klvana sent Diederick and her son home at approximately 3 a.m. Both Doyle and Klvana stated that the baby was fine. Despite the difficult delivery, no further medical referral to a pediatrician was made by Klvana. At 6:30 a.m., Diederick's mother discovered mucous coming out of the baby's mouth and that he had stopped breathing. Diederick's husband administered CPR, and the paramedics were summoned. Epinephrine was administered on the way to the hospital. The baby was not breathing and did not have a heartbeat upon arrival at Children's Hospital of Orange County (Children's Hospital), where he ultimately died some days later.

Klvana contacted Diederick twice after the baby was hospitalized, severely criticizing her for having taken the baby to the hospital. He told her everything would have been fine had she contacted Doyle rather than the paramedics, stating that "once the hospitals get ahold of [a baby], they force blood on him, they do all these different things, and anything could kill him then."

On February 9, 1984, when Diederick's attorney's investigator presented Klvana with a release and demanded Diederick's medical chart, Klvana falsely indicated he had given the chart to his own attorney.[12] Moreover, although Diederick's medical chart was missing when Garden Grove Police Officer Stephen Jankowski and BMQA investigator Heckl visited Klvana's office, Evalena Verducchio, a licensed vocational nurse who attended diet

---

[12]The attorney to whom Klvana referred was not licensed to practice in California and had not been given Diederick's chart.

patients at Diet-Rite, subsequently saw Klvana and Doyle write something in Diederick's chart.

*The Ennis Death*

Kim Ennis visited Klvana's Temple City office on January 18, 1984. Ennis informed Klvana that she was anemic and was taking iron.

Ennis paged Doyle when her labor began on the afternoon of May 19, 1984. Doyle told Ennis that she and Klvana would meet her at the office. When Doyle arrived, she informed Ennis that Klvana was attending another birth but would arrive soon thereafter. Doyle performed a pelvic examination, determined that Ennis was dilated two centimeters, and informed Ennis that they still had awhile before delivery. Ennis and her husband were eating a meal in a local restaurant when her contractions intensified. Klvana's office was closed when Ennis returned. A person named Gale arrived, admitted Ennis to the office, and indicated that Doyle was on her way. Ennis's water broke as she walked up the stairs to Klvana's office. A pad inside her underwear was stained with meconium. When Doyle arrived, she saw the meconium but indicated that everything was all right.

After another pelvic examination, Doyle determined that Ennis was dilated five centimeters. At approximately the same time that Klvana entered the room, a baby boy was delivered in heavy meconium. Although breathing, the baby was blue and congested. Klvana stated that he had to get the meconium out from the baby's throat. Doyle suctioned meconium with a bulb syringe and the baby was no longer blue.

Doyle telephoned Dr. Paul Fleiss and described the situation. Following this conversation, everyone, including Klvana, took the baby to Dr. Fleiss's office. As soon as Dr. Fleiss saw the baby boy, he knew that he was in a life-threatening condition and ordered that the baby be taken to Children's Hospital, where he was intubated and placed on a respirator. Had Dr. Fleiss been given an accurate description of the situation, he would have told Doyle to immediately take the baby to a hospital rather than to his office. At this point, the baby's chance of survival was less than 15 percent; had the baby been managed properly during the delivery, survival would have been probable. The baby died on May 26, 1984.

Dr. Cheryl Lew, the treating neonatologist, concluded that meconium aspiration was the major cause of death. Dr. Lew further believed that the baby may have sustained massive intracranial hemorrhage during labor and delivery.

Doyle informed Dr. Fleiss that she wanted to hospitalize Ennis's baby immediately after birth but that Klvana rejected the suggestion because "he [did] not like to transfer babies to hospitals because he doesn't want to be evaluated by doctors at the hospital." Dr. Fleiss testified that, prior to the Ennis delivery, he had spoken to Klvana and Doyle about contacting hospitals which had neonatal transport facilities. He informed them that if a baby needed immediate transport, they could call such a hospital, and its neonatal team would take the baby to a hospital in a vehicle which had all the necessary equipment to assist the baby's breathing.

## The Friel Death

Debbi Friel, a diabetic, consulted Klvana when she became pregnant in 1984 because she was happy with an earlier delivery he had performed. She was assigned an October 10, 1984, due date. Despite having knowledge of Friel's diabetic complication, Klvana failed to add 10 points to a pregnancy risk assessment form. Due to the size of the fetus, Klvana told Friel that he planned to induce labor with Pitocin on September 24, 1984,[13] i.e., some 16 days prior to the normal delivery date.

On August 1, 1984, Friel had experienced sugar in her urine and consulted Dr. P. L. Cangiano. Dr. Cangiano determined that Friel's diabetes was "out of control" and increased her insulin dosage. Friel notified Klvana that her insulin level had been increased.

Friel experienced contractions on the evening of August 29, 1984. Friel's husband contacted Shirley Wilson, a midwife, who met them at Klvana's office the following morning. Klvana examined Friel's pelvis, found that she was dilated three centimeters, and informed her that she would deliver that afternoon. At approximately 11 a.m., Klvana determined that Friel was dilated five centimeters and broke her water to speed delivery. Friel's chart contained a notation that Friel had dilated to nine centimeters but that she was not transferred to a hospital.

A baby boy was delivered at 12:48 p.m. He was bluish purple in color, wheezing, and would not cry or nurse. Klvana assured Friel the baby would be all right in twenty-four hours, instructed her to give him sugar water, and told her to return in one or two days. Klvana made no referral to a pediatrician.

Friel went to sleep at 10 p.m. When she awoke, she discovered that her son was not breathing and she called paramedics. The baby was taken to Henry Mayo where he was pronounced dead.

---

[13]The date of induction was subsequently changed to September 5, 1984.

An autopsy determined the baby's cause of death was perinatal complications associated with a diabetic mother and prematurity.

Klvana visited Friel later that morning. Klvana told Friel the police would accuse both of them of killing the baby if she told them that she had planned a hospital delivery but did not know the name of the hospital. Klvana indicated that he would insert the name of a hospital in Friel's medical records. Klvana stated the baby would have died anyway even if hospitalized immediately.

*The Palacios Death*

Arleen Palacios was examined by Klvana on June 27, 1984, and given a March 6, 1985, due date. Palacios's water broke on February 28, 1985. When Doyle arrived at Palacios's home, she discovered that Palacios was dilated only one or two centimeters. Doyle contacted Klvana, who instructed Doyle to bring Palacios to his office since he was busy attending other patients.

At Klvana's office, he administered Pitocin to Palacios intravenously. Neither an infusion pump nor an electronic fetal monitor was used. The fetus's heart was monitored with a stethoscope. Klvana stopped administering Pitocin three hours later since, though fully dilated, Palacios had not delivered and was too tired to continue. Although Klvana gave Palacios the choice of either spending the night at the office or having a Cesarean section delivery at a hospital, he did not inform her of the risks associated with delaying the delivery until the next day. Palacios and Doyle spent the night at Klvana's office; Klvana went home. Doyle did not check on Palacios's condition from 11 p.m. until the next morning, at which time she conducted a pelvic examination.

When Klvana returned to the office, he again administered Pitocin intravenously, and then attended other patients. The fetus's heart rate dropped shortly after the Pitocin was administered. Doyle told Palacios she had to push the fetus out or it was "not going to make it." Palacios asked to be taken to Children's Hospital, but was told it was too far. She was told the closest hospital was Arcadia Methodist Hospital of Southern California (Arcadia), but that Klvana was not permitted to work there. Doyle, in Klvana's presence, told Palacios to go to the emergency room at Arcadia but not to mention that Klvana was her doctor. Upon Palacios's arrival, Arcadia's emergency room personnel noted gross meconium staining. Palacios was completely effaced (i.e., her cervix was obliterated) and she was dilated 10 centimeters.

An episiotomy was performed on Palacios, and a stillborn fetus covered with meconium was delivered. Palacios's cervix was full of meconium and her blood pressure was elevated.

Dr. Harry Chew, the obstetrician who attended Palacios at Arcadia, indicated the baby's cause of death was "intrauterine asphyxiation, secondary to fetal hypoxia during labor," which could have been caused by Klvana's unmonitored administration of Pitocin without an infusion pump while the fetus was in an occiput posterior position.[14]

*The La Verne Death*

When Tosha La Verne's water broke on September 9, 1986, the water was a brownish color. She was told by Dr. Schober that she would give birth within 48 hours. She was sent home with arrangements to deliver at Klvana's office.

La Verne went to Klvana's office at 10 a.m. on September 10, 1986. Klvana listened to the fetus's heart and conducted a pelvic examination. La Verne was dilated three centimeters. La Verne continued to experience vaginal discharge of a thick brown liquid throughout the duration of her labor. La Verne told Klvana she did not desire Pitocin. Klvana told her not to worry about the discharge and administered vitamins and minerals to her intravenously. No one monitored the heartbeat of the fetus. By 6 p.m., Klvana sent La Verne home with an antibiotic and a muscle relaxant, and told her to return two days later unless there was an emergency.[15]

La Verne's contractions were strong on the next evening. She took a muscle relaxant and went to sleep at around 10 p.m.

On the morning of September 12, 1986, Klvana performed a pelvic examination and indicated that La Verne would deliver early that afternoon. At 1 p.m., Klvana administered Pitocin to La Verne intravenously. Dr. Schober informed La Verne's mother that, despite La Verne's objection to its use, Pitocin was necessary. No one was monitoring the fetus's heartbeat. Dr. Schober stopped the Pitocin at 3:30 p.m., when La Verne's hand began to swell, but resumed administration for approximately two more hours.

Klvana manipulated La Verne's vagina while Dr. Schober pushed on her abdomen. A baby girl was delivered at 6:45 p.m. She appeared normal

[14]In this position, the back of the fetus's head is toward the mother's back. Such a fetus needs a wider diameter of the pelvis to get through. If Pitocin is administered while the fetus is stuck against the pelvic bone, hypoxia can result.

[15]The reason Klvana did not see La Verne the following day was that the office was closed on Thursdays.

except for an exceptionally flat and elongated head. Klvana placed the baby in a tub of water and inserted a tube in her throat to suck out the mucous from her lungs. Klvana listened to the baby's heart with a stethoscope and indicated that she was fine.

At 8 p.m., Klvana told La Verne she should go home. La Verne collapsed when Klvana tried to lift her. About an hour later, La Verne left for home. Despite the baby's flat and elongated head, Klvana told La Verne there was no need to have the baby examined by another physician until September 15, 1986.

By 6 a.m. on September 15, 1986, the baby girl was not breathing and was blue, stiff and cold. Paramedics were summoned and the baby was taken to Huntington Memorial Hospital (Huntington) at 7:11 a.m. Following unsuccessful attempts at resuscitation, the baby was declared dead at 7:15 a.m.

An autopsy determined that the cause of death was coartation of the aorta and congenital heart disease. Prior to trial, the People requested a reexamination of the cause of death by Dr. Zdena Pavlova, a pediatric pathologist at County Hospital Medical Center at Women's Hospital. Following this examination, the baby's cause of death was changed to hypoxia associated with amniotic fluid and meconium aspiration in the baby girl's lungs. A second pediatric pathology expert similarly found evidence of aspiration of the amniotic content.

After the baby girl had died, Klvana went to La Verne's house and inquired whether anyone had asked any questions regarding the delivery. He stated that the death would be blamed either on the La Vernes or on him. He told the La Vernes to state that they were planning on a hospital delivery but that La Verne went into labor when she was in Klvana's office. Klvana asked that the La Vernes not mention either Dr. Schober or Doyle to the authorities. At Klvana's request, La Verne subsequently met him at Dr. Schober's office to fill out new papers so that he could create a new medical chart.

*Other Deliveries*

Evidence of deliveries, unrelated to those which resulted in charged crimes but relevant to Klvana's subjective awareness that his methods were dangerous to human life, was introduced at trial.

On September 20, 1981, Mary DeGennaro's water broke. Klvana met DeGennaro at Granada Hills. He began administering Pitocin at 5 a.m. the

following morning. DeGennaro was first connected to an electronic fetal monitor and then to an internal monitor. Klvana detected meconium staining and a decrease in the fetus's heartbeat. He indicated that the meconium staining was a bad sign and that no more than two hours could pass before he would have to perform a Cesarean section delivery. The baby was delivered without complications.

On December 9, 1982, Karen Noel was admitted to Northridge. Noel had previously indicated to Klvana that she desired a vaginal delivery. Although Klvana verified that the baby was in a breech position, he neither informed Noel of the risks of brain damage or death posed by a vaginal delivery nor prepared her for a Cesarean section delivery. After a baby boy was vaginally delivered, he was taken to the neonatal intensive care unit, remained hospitalized for 13 days, and suffered temporary nerve damage and speech impairment. Northridge's nursing staff brought Klvana's management of the Noel delivery to the attention of Dr. Gary Feldman, the chair of Northridge's obstetrics and gynecology department. Feldman informed Klvana that the baby should have been delivered by Cesarean section, restrictions would be placed on his hospital privileges, and a report would be made to BMQA. No such report was ever made, however, since Klvana resigned his privileges prior to the meeting scheduled to review his conduct.

*Expert Testimony*

Dr. Samuel Meals, a board-certified obstetrician and gynecologist, testified that continuous electronic fetal monitoring and administration by infusion pump are necessary when Pitocin is used to induce or augment labor.

Dr. Gary Oakes, a board-certified obstetrician and gynecologist with a subcertification in high-risk obstetrics, testified that his review of the Johnson, Fava, James, Diederick, Palacios, Ennis, Friel, Ginsberg, and La Verne deliveries revealed the following recurring events: use of Pitocin without adequate fetal monitoring, unmanaged signs of fetal distress, failure to adequately perform neonatal resuscitation, failure to transfer sick babies to the hospital, and failure to transfer high risk mothers for hospital deliveries. He further testified that Klvana should have had a hospital transport mechanism to handle the inevitable complications which arise in office deliveries. He also stated that Pitocin should be administered only by an intravenous infusion pump along with monitoring of the fetus. A stethoscope is insufficient for this purpose because it cannot detect subtle changes. Dr. Oakes described as "common everyday obstetrics" the knowledge that Pitocin was contraindicated in cases of possible cephalopelvic disproportion and where a mother had prior Cesarean section deliveries. Since meconium-stained fluid is a warning sign of possible fetal distress, an obstetrician who

detects it must assume fetal distress until the contrary is proven. Furthermore, any meconium must be suctioned out prior to the baby's first breath to prevent aspiration into the baby's lungs. Dr. Oakes stated that Klvana's experiences during his Downstate and Loma Linda residencies, as well as his repeated loss of hospital privileges and warnings by other physicians served notice on Klvana that "he had difficulty in judgment-making, particularly regarding the management of obstetric patients." Dr. Oakes indicated it was impossible to believe that Klvana was not aware of the risks he was disregarding.

*Other Evidence*

The files of various patients were among the evidence retrieved in a search of Klvana's office. These files revealed that Klvana utilized a "Popras" form which listed 63 potential problems associated with pregnancy, including diabetes, Rh sensitivity, and anemia, with a risk value assigned to each complication. Some of the files contained a "high risk identification" sheet which listed fetal distress and maternal diabetes as conditions requiring notification of a pediatrician before delivery, and respiratory distress as a condition requiring notification of a pediatrician as soon after birth as possible.

In a search of Doyle's residence, Jankowski recovered a modified version of Dr. Mehmet Kasim's "1980 Prenatal Care Standards for San Fernando/Antelope Valley Health Services Region." This guidebook had been modified for use in Klvana's Temple City and Newhall offices. As modified, the guidebook listed 14 "obstetrical problems," including diabetes, prematurity, postmaturity, previous Cesarean section delivery, and Rh sensitivity.

Toward the end of 1983, Drs. Jay Gordon and Fleiss met with Klvana and Doyle and informed them that some babies, such as those where meconium is present when the membranes are ruptured, should be delivered only in a hospital and that a baby displaying any problems should be immediately referred to a pediatrician. In December 1983 or January 1984, Dr. Fleiss introduced Klvana and Doyle to Dr. Hai Abdul, who had been disciplined by BMQA for performing high-risk out-of-hospital deliveries. Dr. Abdul informed Klvana of the reason for his having been disciplined and that only low-risk deliveries should be performed out-of-hospital.[16]

ISSUES

On appeal, Klvana contends that (1) the convictions for second degree murder must be reduced to involuntary manslaughter since the evidence of

---

[16]Additional facts will be discussed in conjunction with the issues to which they pertain.

implied malice was insufficient; (2) evidentiary rulings by the trial court denied him a fair trial; and (3) his sentences on the second degree murder counts are constitutionally disproportionate.

In the petition for a writ of habeas corpus, Klvana contends he was denied the effective assistance of trial counsel due to the following purported inadequacies: (1) failure to fully investigate all potential defenses, (2) failure to present Klvana's testimony, (3) failure to object, (4) deficient closing argument, and (5) assorted omissions.

DISCUSSION

I. *The Appeal*

*Sufficiency of the Evidence*

Klvana asserts insufficient evidence was presented to support the second degree murder convictions. Specifically, Klvana argues "the only reasonable inference to be drawn from the overwhelming evidence of [Klvana's] technical incompetence and abject lack of medical judgment spanning the better part of seven years before the first death and all the attendant circumstances spanning the eleven year period beginning with [Klvana's Downstate] residency and culminating with the [La Verne] death was that [Klvana] simply did not appreciate the life-threatening risks involved and/or his responses were an 'extreme departure' from the prevailing standards of care. . . . To find otherwise would be to sustain [Klvana's] second degree murder convictions on assumptions by an objective standard, not [on] substantial evidence of his subjective awareness and conscious disregard of the life-threatening dangers." (Italics omitted.) While this is an appropriate argument to make to a jury, and indeed was made to the jury in this case, it is inappropriate to ask an appellate court to reweigh the evidence and draw inferences which were rejected by the jury. (*People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 168 [246 Cal.Rptr. 915]; *People* v. *Summers* (1983) 147 Cal.App.3d 180, 183-184 [195 Cal.Rptr. 21].) After reviewing the evidence presented at trial, we conclude sufficient evidence was presented from which the jury could reasonably infer that Klvana was subjectively aware his methods of home and office deliveries were life-endangering, but consciously and deliberately disregarded these risks.

"Section 187, subdivision (a), provides that 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' Under section 188, malice may be express or implied, and implied malice is present 'when no considerable provocation appears, or when the circumstances

attending the killing show an abandoned and malignant heart.' Section 189 defines first degree murder as all murder committed by specified lethal means 'or by any other kind of willful, deliberate, and premeditated killing,' or a killing which is committed in the perpetration of enumerated felonies; all other kinds of murder are of the second degree." (*People* v. *Watson* (1981) 30 Cal.3d 290, 295 [179 Cal.Rptr. 43, 637 P.2d 279].)

■ "Second degree murder based on implied malice is committed when the defendant does not intend to kill, but engages in conduct which endangers the life of another, and acts deliberately with conscious disregard for life. [Citation.] ■ An essential distinction between second degree murder based on implied malice and involuntary manslaughter based on criminal negligence, is that in the former the defendant subjectively realized the risk to human life created by his conduct, whereas in the latter the defendant's conduct objectively endangered life, but he did not subjectively realize the risk. [Citations.]" (*People* v. *Brito* (1991) 232 Cal.App.3d 316, 321, fn. 4 [283 Cal.Rptr. 441].)

■ Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 346-347 [233 Cal.Rptr. 368, 729 P.2d 802].) ■ "Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People* v. *Towler* (1982) 31 Cal.3d 105, 118-119 [181 Cal.Rptr. 391, 641 P.2d 1253], original italics, fn. omitted.)

■ In the case at bench, the jury was presented with overwhelming evidence from which it could conclude beyond a reasonable doubt that implied malice existed when Klvana performed each delivery which formed the basis of a second degree murder conviction. This evidence included the Pitocin-related mishap at Downstate which prevented Klvana from becoming chief resident; the Loma Linda patient death, as well as Drs. Brandstater's and Brauer's advisements to Klvana regarding his cavalier attitude; Klvana's misrepresentation of his board eligibility and his omissions of his former affiliation with Loma Linda or his probationary status on subsequent applications for privileges; the revocation of Klvana's privileges by various hospitals; Klvana's exposure during the DeGennaro delivery to the warning sign posed by meconium staining and the proper use of a fetal monitor when administering Pitocin; Klvana's exposure during the Noel delivery to the need, in appropriate cases, to deliver via Cesarean section; the use of Popras and high-risk forms which flagged the serious risks posed by many of the deliveries underlying the second degree murder convictions; the first Ginsberg death, with which Klvana was not charged but which predated the

charged deliveries and involved many of the same risk factors (e.g., meconium staining, Rh sensitivity, premature delivery), and Dr. Solomon's subsequent admonishment concerning Klvana's dangerous practices; Drs. Gordon's and Fleiss's warnings to Klvana concerning the dangers associated with out-of-hospital deliveries; Klvana's meeting with Dr. Abdul, who had been sanctioned by BMQA for performing high-risk out-of-hospital deliveries; Klvana's testimony in the James malpractice case where he acknowledged that high-risk patients should deliver in a hospital; Klvana's requests that certain patients either suppress the facts surrounding their deliveries (e.g., Fava, James, and La Verne) or lie to the authorities (e.g., Friel); and the similarity of the factors present in a number of the deaths (e.g., misuse of Pitocin [Johnson, Fava, James, Diederick, Palacios, La Verne], problems relating to meconium [Ginsberg, Ennis, Palacios, La Verne], high-risk conditions [Ginsberg, Ennis, Friel], and respiratory problems [Johnson, Friel, La Verne]).[17]

*Evidentiary Rulings*

■ Klvana asserts evidentiary rulings by the trial court denied him a fair trial. These rulings involved admission of evidence of the 1976 Loma Linda patient death which Loma Linda determined was a result of Klvana's inadequate administration of anesthesia, and the statement of decision and judgment from the James malpractice action. We conclude the trial court's evidentiary rulings were proper.

a. *The 1976 Loma Linda Death*

Prior to the parties' opening statements to the jury, Klvana argued, pursuant to Evidence Code sections 210 and 352, that the 1976 Loma Linda death was not relevant or, if relevant, was excludable as unduly prejudicial.[18] In overruling these objections, the trial court indicated:

"The motion with respect to the facts and circumstances surrounding the death of the patient at [ ] Loma Linda will be denied . . . .

---

[17]Klvana's attempt to demonstrate that implied malice was not proven beyond a reasonable doubt since the case at bench is factually distinguishable from *People* v. *Protopappas, supra,* 201 Cal.App.3d 152, is unavailing. Despite dissimilarities between Klvana and the defendant in *Protopappas,* the jury was provided with overwhelming evidence of implied malice.

[18]Evidence Code section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"I understand the argument with respect to it's [*sic*] being unduly prejudicial, and a consumption of time.

"I do think it is highly relevant to Dr. Klvana's state of mind to the extent that that is what he was told was the reason or one of the reasons that he was being released or terminated from the anesthesiology residency.

"I think that does go very significantly to his state of mind and the state of mind that he had when he entered into the obstetrics and gynecology practice, which, I understand, is what he did following the termination of that residency.

"So balancing the high degree of relevance with the element of prejudice, I do not find that the prejudice and the consumption of time outweigh[] the relevance, and the motion is denied on that basis."

The trial court's ruling does not constitute an abuse of discretion. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251].)

The trial court correctly noted the relevance of the Loma Linda death, and the hospital's determination (which it conveyed to Klvana) that he was responsible, to the critical issue of subjective awareness. Evidence that Klvana had been informed well before the first death charged in this case that his failure to properly monitor the administration of a drug caused the death of a patient was clearly relevant to the issue of subjective awareness.[19]

With regard to Evidence Code section 352, Klvana argues that, "[w]hile the court did balance 'the high degree of relevance' with 'the element of prejudice' to find the latter did not outweigh the former, [] it neither explained why evidence of the 'state of mind' [Klvana] carried to his obstetrics practice after termination of his anesthesiology residence [*sic*] in 1976 had a 'high degree' of relevance nor identified the obvious prejudice balanced against it." However, the trial court was not required to do so. What was required, and what the trial court clearly did, was "to make an explicit finding on the record that the probative value of the evidence outweighed the risk of prejudice." (*People v. Frank* (1985) 38 Cal.3d 711, 732 [214 Cal.Rptr. 801, 700 P.2d 415].)

---

[19]Klvana's related assertion that, "while the anesthesiology patient death may have proved [Klvana] knew he was considered incompetent to administer anesthesia in 1976, it had no tendency in reason whatsoever to prove [Klvana] knew or even should have known any obstetrical practice he might undertake six years later was life-threatening and he accordingly consciously ignored the deadly risk" goes to the weight of the evidence, not its admissibility. Like his arguments concerning the sufficiency of the evidence, *ante*, the effect of the remoteness of the Loma Linda evidence is a subject for the jury's determination, not an appellate court's.

b. *Evidence of the James Malpractice Action*

Prior to trial, Klvana objected to admission of any evidence of the James malpractice action. The trial court indicated that the parties could mention the lawsuit in their opening statements, but could not mention the civil trial judge's statement of decision in that action until the trial court ruled on its admissibility.

The trial court subsequently ruled the testimony from the civil action was admissible, but again deferred its ruling on the admissibility of either the statement of decision or the judgment.

The following colloquy occurred during Klvana's cross-examination of James:

"Q [] During that civil trial—that malpractice case against Dr. Klvana, Dr. Klvana didn't have a lawyer at that case, did he?

"A No.

"Q He was representing himself?

"A Yes.

"Q And you were awarded a million dollar judgment in [that] case; is that right?

"A I think it was 800,000.

"Q You never collected any money, did you?

"A No."

When the matter of the admissibility of the statement of decision was argued, one of Klvana's attorneys explained his tactical decision as follows: "It is our position that we're going to attack her on the position of whether or not she had a bias against Dr. Klvana because of the amount that was rendered in her favor and she couldn't collect on the judgment." Defense counsel nonetheless argued that the judgment and the statement of decision should be excluded pursuant to Evidence Code section 352. In overruling the objection, the trial court stated: "My major concern about the undue prejudice was the effect that it would have on the jury knowing that a judge in another case found that Dr. Klvana was guilty of medical—or was liable for medical malpractice, and, therefore, because of the nature of the cross-examination, I think that that has been—my concern there has been dissipated since the jurors already know that there was a judgment rendered by

Judge Sotille or they know at least there was a judgment rendered against Dr. Klvana." The trial court then reviewed each portion of the statement of decision with the parties and determined that certain sections should be excised pursuant to Evidence Code section 352.

On appeal, Klvana initially asserts that, given the date of the statement of decision, it was only admissible as to the La Verne death and therefore its relevance was "unquestionably limited." Furthermore, given the risk that the jury would use this evidence to furnish the subjective awareness required for all nine counts of second degree murder, the trial court abused its discretion by not excluding this evidence pursuant to Evidence Code section 352. In light of the relevance of the statement of decision, in its excised form, to the issue of subjective awareness on the La Verne count, and the diminished prejudice of this information due to Klvana's cross-examination of James, we conclude the trial court did not abuse its discretion in admitting this evidence. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1239.)[20]

*Disproportionality of Sentence*

On May 2, 1989, as part of a plea bargain, Doyle withdrew her not guilty plea and entered a plea of guilty to three counts of involuntary manslaughter, five counts of practicing medicine without a license, one count of conspiracy, and seven counts of insurance fraud. The remaining counts against

---

[20]Klvana's related assertion that the jury "necessarily should have been instructed regarding the limited purpose for which the evidence was received, as well as told [Judge] Sotille's factual findings regarding [Klvana's] conduct were based on the evidence adduced at the malpractice trial using a 'preponderance of the evidence' rather than 'beyond a reasonable doubt' standard and, more particularly and importantly, those findings were neither binding on them nor dispositive of the issues presented" is without merit.

We note that the jury was instructed that "[e]vidence has been introduced for the purpose of showing that [Klvana] committed acts or crimes other than those for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that [Klvana] is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent or mental state which is a necessary element of any of the crimes charged; [¶] The identity of the person who committed any of the crimes of which [Klvana] is accused; [¶] A motive for the commission of any of the crimes charged; [¶] [Klvana] had knowledge of the nature of things found in his possession; [¶] [Klvana] had knowledge or possessed the means that might have been useful or necessary for the commission of any of the crimes charged; [¶] Any of the crimes charged is a part of a larger plan, scheme or conspiracy; [¶] The existence of a conspiracy. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

If Klvana desired a more specific limiting instruction, it was incumbent upon him to submit one for the trial court's consideration. (Evid. Code, § 355; *People* v. *Simms* (1970) 10 Cal.App.3d 299, 311 [89 Cal.Rptr. 1]; cf. *People* v. *Collie* (1981) 30 Cal.3d 43, 65 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

Doyle were dismissed. The trial court sentenced Doyle to an aggregate term of eight years, the maximum permissible sentence under section 1170.1, subdivision (f), suspended the sentence, and placed Doyle on five years' probation with stringent conditions.

 Relying heavily on *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], Klvana asserts that the 45-years-to-life sentence imposed on him for 3 counts of second degree murder was constitutionally disproportionate to the sentence given to Doyle, whom he describes as an "equally culpable coconspirator."[21] Before explaining why Klvana's reliance on *Dillon* is misplaced, we briefly set forth the standards for assessing a claim of disproportionality.

In *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], the Supreme Court set forth three "techniques" with which to assess a defendant's claim that his sentence is disproportionate:

"First, a number of courts have examined the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The second technique used by the courts is to compare the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Closely related to the foregoing is the third technique used in this inquiry, i.e., a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (8 Cal.3d at pp. 425-427, italics and fn. omitted.)

The Supreme Court admonished, however, "[w]hether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors,

---

[21]Although Klvana repeatedly refers to his sentence as a "death sentence" since, given his age, he claims a "substantial likelihood" exists that he will die in prison, his briefs clearly indicate that his disproportionality challenge is premised on his relative culpability.

and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (8 Cal.3d at pp. 423-424.)

In *Dillon*, the defendant, a 17-year-old boy, and 6 of his classmates entered a marijuana farm with the intent to steal some of the farm's crop. The defendant was armed with a rifle. When an armed man guarding the farm approached the defendant, he panicked and fired his rifle several times. The man died from nine bullet wounds. The defendant was convicted of first degree felony murder and attempted robbery. In applying the first *Lynch* technique (i.e., the nature of the offense and the offender), the Supreme Court noted the defendant's age and psychological immaturity, the concern expressed by the jury at the severity of the felony-murder rule, the circumstances of the crime, and the fact that, due to the defendant's age, "no greater punishment could have been inflicted on [the] defendant if he had committed the most aggravated form of homicide known to our law" (34 Cal.3d at p. 487), and concluded the punishment inflicted was disproportionate to the "defendant's attenuated individual culpability." (*Id.* at pp. 486-488.) Finding "that in the circumstances of this case the punishment of this defendant by a sentence of life imprisonment as a first degree murderer violates article I, section 17, of the [California] Constitution," the court reduced the conviction to second degree murder. (*Id.* at p. 489.)

We note that Klvana's premise is faulty since Doyle was not as culpable as Klvana. Unlike Klvana, who pleaded not guilty to all counts and was found guilty of murder, Doyle pleaded guilty to involuntary manslaughter. Moreover, Doyle had nothing to do with, and was not charged with, the deaths which underlie the three counts of second degree murder for which Klvana was given the forty-five-years-to-life sentence. Additionally, while both Doyle and Klvana repeatedly ignored the fact that their methods of delivering babies were life-threatening, it must be remembered that Doyle, an unlicensed midwife, was working under the supervision of Klvana, a licensed medical doctor. Under these circumstances, we conclude that Doyle was not Klvana's "equally culpable coconspirator" and therefore reject Klvana's disproportionality argument.[22]

---

[22]In light of our holding that Doyle was not Klvana's equally culpable coconspirator, we need not address the Attorney General's assertion that the Supreme Court's notation in *Dillon* that "the excessiveness of [the] defendant's punishment is underscored by the petty chastisements handed out to the six other youths who participated with him in the same offenses" (34

## II. THE PETITION

*Standard of Review*

■ " ' "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." ' [Citations.] 'First, the defendant must show that counsel's performance was deficient.' [Citations.] Specifically, he must establish that 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] In evaluating defendant's showing we accord great deference to the tactical decisions of trial counsel in order to avoid 'second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel "to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . ." ' [Citations.] 'However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." ' [Citation.]" (*In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862].)

*Failure to Investigate*

■ Klvana asserts that both of his trial counsel were constitutionally deficient for failing to investigate and present a psychiatric defense. He states that his " 'failure-to-investigate' challenge is to counsels' inexplicable failure to offer the jury any evidence whatsoever regarding his state of mind through expert opinion testimony which would have explained the effect of certain *personality traits* on [his] purported ability to 'learn from his mistakes' from which the jury could ultimately conclude as a matter of fact rather than mere speculation [he] was not subjectively aware of and did not consciously disregard the life-threatening risks associated with his obstetrical practices." (Italics added.) In support of this contention, Klvana has attached the reports of Dr. Charles Saunders, a medical doctor who is board certified in psychiatry, and Dr. Francisco Nunez, a clinical psychologist.

Initially, it must be noted that "[c]riminal trial counsel [have] no blanket obligation to investigate possible 'mental' defenses." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1244 [275 Cal.Rptr. 729, 800 P.2d 1159].) However, in this case, defense counsel did refer Klvana for a psychiatric evaluation.

Cal.3d at p. 488, fn. omitted) was not intended to create a new "technique" for assessing claims of disproportionality.

Dr. Irwin Lerhoff, a psychologist, administered a number of psychological tests and submitted his conclusions to defense counsel. Although a declaration by Dr. Lerhoff, submitted as part of this writ petition, indicates that "[t]he sole purpose for which [he] was retained was to render an opinion which would assist in deciding whether Dr. Klvana should testify in his own defense," and that he "was not asked to evaluate Dr. Klvana regarding 'implied malice' or his 'subjective awareness of the life-threatening risks' associated with his obstetrical practices or to render an opinion on those issues and did not render an opinion on those issues," at the sentencing hearing Dr. Lerhoff testified he "found no medical explanation that would cause [him] to say Dr. Klvana was unable to know what he was doing was dangerous to human life."

In his report, Dr. Saunders indicates that he formed his opinion based on Dr. Lerhoff's tests, analysis, and testimony; Dr. Oakes's testimony; and various items which discuss the meaning of subjective awareness. Dr. Saunders also interviewed Klvana. The report reveals that Klvana does not suffer from any medically recognized mental disorder; rather, Klvana exhibits nonpathological *personality traits.*[23] Following a discussion of Klvana's explanations of such things as why he misrepresented his board eligibility and how he never used Pitocin (explanations which were apparently accepted at face value by Dr. Saunders despite the overwhelming evidence to the contrary), Dr. Saunders concluded that Klvana "had no subjective awareness that his practice posed life threatening risks or a high probability of death for his patients at [the] time of and after the first and each subsequent death from December 1982 to March 1985."

Preliminarily, we note that Dr. Saunders's report does not demonstrate that Klvana suffers from a "mental disease, mental defect, or mental disorder" (§ 28, subd. (a)[24]); rather, all that is shown is that Klvana has certain personality quirks.

---

[23]Dr. Saunders's report states, in pertinent part:
"Dr. Klvana emerges as being of only average intelligence despite his academic achievements. He tends to be compulsive with a great capacity to focus on a given task. He does poorly when dealing directly with emotional material or situations tending to use intellectualization instead. He tends to be negativistic, his productivity suffering when under stress. His character structure is relatively immature frequently resorting to the primitive defenses of denial or projection when he perceives a threat. He does not easily learn from his mistakes. Dr. Klvana does not react to criticism well. He does not accept it as useful or fight for his beliefs. Rather he tends to ignore any criticism if at all possible."

[24]Section 28 provides, in pertinent part:
"(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is

Moreover, Dr. Saunders's ultimate conclusion that Klvana was not subjectively aware that his practices were life-threatening is inadmissible. (§ 29.)[25]

Furthermore, even if Dr. Saunders's conclusion on the ultimate issue of Klvana's state of mind were admissible, the report submitted in support of the petition is deficient since it does not explain the link between Klvana's personality traits and the conclusion concerning subjective awareness. (See *People v. Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777] ["[t]he chief value of an expert's testimony . . . rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion . . . ."].)[26]

In light of the foregoing, Klvana clearly has failed to meet his burden of proof. (*In re Fields, supra,* 51 Cal.3d at pp. 1069-1070; *People v. Gonzalez, supra,* 51 Cal.3d at p. 1244; *People v. Williams* (1988) 44 Cal.3d 883, 937, 945 [245 Cal.Rptr. 336, 751 P.2d 395].)

*Failure to Present Klvana's Testimony*

On October 10, 1989, Klvana acceded to his counsel's advice and waived his right to testify. On October 23, 1989, Klvana filed a document with the court which expressed his desire to testify and indicated the content of his proposed testimony. The trial court denied his request.

In his petition before this court, Klvana has submitted a declaration which provides, in part:

admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

[25]Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

[26]Similarly, the report prepared by Dr. Nunez, who did not personally interview Klvana but rather "re-analyzed" the results of Dr. Lerhoff's tests, confirms that Klvana does not suffer from a medically recognized mental disorder. Without providing a detailed link between Klvana's condition and Dr. Nunez's conclusion, the two-page report describes generalities of the behavior of "[i]ndividuals with Dr. Klvana's profile" and indicates the existence of "evidence of *personality traits* which could *potentially* impair and limit his ability to foresee, prevent or deal with acute crisis situations." (Italics added.)

"15. The decision to waive my right to testify on my own behalf was ultimately made because [defense counsel] Leonard refused to call me to testify and said he would inform the court he had no questions and I would be left to face [the] prosecutor and jury alone. I would not have waived my right to testify if Leonard had not indicated he would refuse to participate in my examination if I took the stand.

"16. The reason I changed my mind and I sought to exercise my right to testify thereafter was I realized the jurors would know nothing about me or my practice except what the prosecutor had told them and even without Leonard's participation I could tell the jury I was a responsible doctor deeply concern [sic] for and supportive of my patients."

Noticeably absent from Klvana's petition are declarations by his trial counsel. However, the soundness of trial counsel's conscious tactical decision to not call Klvana as a witness is amply demonstrated by the record.

At the October 10, 1989, hearing, Klvana personally waived his right to testify. The following colloquy transpired:

"MR. LEONARD: . . . It's my understanding in talking with Dr. Klvana that he does not wish to testify in his behalf, knowing he has the absolute right to testify; is that correct?

"[KLVANA]: Yes.

"MR. LEONARD: And I join in that.

"THE COURT: Dr. Klvana, we've talked a lot. I know that you understand you have the right to testify; correct?

"[KLVANA]: Correct.

"THE COURT: And after consulting with your wife and some friends of yours and thinking about everything that we have talked about, you have decided that you want to give up that right and not testify; is that correct?

"[KLVANA]: Correct."

At the October 17, 1989, hearing, one of Klvana's counsel made it clear that the decision to not have Klvana testify was purely a matter of tactics. The following was stated on the record outside of the presence of the jury:

"It has been [our] position all along, all through this trial, . . . that we felt it was in Dr. Klvana's best interest not to testify.

"I explained to Dr. Klvana my understanding of the law is that at this stage of the proceedings, it is discretionary with the court as to whether or not Dr. Klvana would be allowed to testify.

"I had told Dr. Klvana I would ask the judge on his behalf.

"I would also have to tell the court that we have not changed our decision in terms of, we do not feel it is in Dr. Klvana's best interest to testify.

"If Dr. Klvana should testify, I cannot tell the court that we will not have to put on additional witnesses. We may be forced into calling additional witnesses because of the testimony that I perceive that Dr. Klvana might give in this courtroom and give this jury.

"I would also put on the record, Judge, that we had, oh, approximately 13, 14 mothers that we had ready to put on for the defense.

"When Dr. Klvana notified me, oh, I think it was the Thursday before the Monday that we started putting on the defense, that he still wanted to testify. I called off a lot of those mothers because those mothers were going to discredit what Dr. Klvana was going to put on in his testimony, and it would be conflicting, and obviously that would not be in his best interests. I called off those mothers.

"When Dr. Klvana then changed his position and said that he was not going to testify, I tried to recall those mothers. Some of the mothers I could get ahold of; some of the mothers I could not, Judge, and some of the mothers just did not want to come in. They changed their minds in terms of wanting to come in and testify for him.

"I had put on some of those mothers, though. Based on what I know as to what Dr. Klvana is going to testify to, the witnesses that [we] put on is going to be conflicting [with] the testimony that Dr. Klvana is going to give to this jury. It might be conflicting. I don't know. But in either event, it is still our position that Dr. Klvana does not wish to testify, but I—I told Dr. Klvana that he should not testify.

"I also told Dr. Klvana this morning I realize he is facing 150 years in jail. I realize that if he falls on the second degree murders, he may be in there for [the] rest of his life.

"I told Dr. Klvana that I would put this on the record, that if he feels still that he wants to testify, that I would ask the court, but that in my opinion,

right now, the way it stands right now in terms of [the prosecutor] arguing Monday; I would argue the following Monday, that in my position, we have a chance at beating this case.

"I told Dr. Klvana, and I told all his supporters that it is not a guarantee, never has been a guarantee, but a tactical decision, that this is the best defense Dr. Klvana could have.

"I also told Dr. Klvana; I told this court; I've told all his supportes [*sic*], that in my judgment, if Dr. Klvana gets up on the stand and testifies, I don't think he would have a chance.

"And that's my position. And I'll submit it, Judge."

On October 23, 1989, outside of the presence of the jury, the trial court asked defense counsel whether they joined in Klvana's "Motion to Reopen the Case for Presentation of Significant Testimony of Evidence." One of Klvana's attorneys responded:

"I am not going to join in that motion. If we had any evidence that we thought this jury should hear, we would have put it on in our case-in-chief. We put on some evidence. We did not put on Dr. Klvana. That was a tactical decision. We all agreed not to.

"As you well know, Dr. Klvana has a change of heart. He tried to ask the court if the court would allow him to testify after we had rested. The court ruled on that and said no.

"Now comes the day that we have the closing statements, and Dr. Klvana would like to ask the court to reopen.

"I am not going to join in that, Your Honor."

The propriety of Klvana's counsel's tactical choice is reflected in the trial court's statements when it denied Klvana's motion. The court stated:

"I note this document is some 47 pages long. I have not read it thoroughly, but as I have flipped through it, it occurs to me that it is, as [the prosecutor] has indicated, interesting in its examples of—as an example of Dr. Klvana's —or [a] window to Dr. Klvana's testimony were he to be permitted to testify.

"I note that with respect to one of the cases, the Julie James case, he says that his intent would be to show that the Popras forms demonstrate inaccurate criteria. I take it that it is Dr. Klvana's suggestion he is going to take on the people who have developed that form.

"I also note that—one of the things I notice is that he would intend to prove that an electronic fetal monitor is not necessary for the practice of obstetrics, that it provides false security, is a labor-saving method used for billing purposes.

"I think that would be real interesting to the jurors who have already heard that Dr. Klvana bought, ordered and purchased an electronic fetal monitor, but that then it happened to be delivered on the day that the search warrant was executed.

"Throughout this, there are characterizations of factual matters or alleged factual matters that, to my mind, reflect once again the wisdom of defense counsel's choice and their recommendation to Dr. Klvana and Dr. Klvana accepting their recommendation at the time, that he not testify, since it is absolutely clear to me that many of the things reflected in this document would be absolutely rejected by the jurors, and they would—to make it absolutely clear, that if Dr. Klvana got on the stand and testified to those things, there is not a person within a hundred feet or a hundred yards of this courtroom, within a mile of the courtroom who wouldn't believe that Dr. Klvana was lying on the stand.

"That is not a judgment that I'm making in the defense of my evaluating his credibility for any purpose other than to suggest, as I have, that this document to me reflects the wisdom of counsel's recommendation to Dr. Klvana that he not testify.

"And I am not going to allow the defense to reopen the case under these circumstances."

"Dr. Klvana, you are lucky that you finally came to your senses for a short period of time and waived your right to testify because I assure you, if you had gotten on the stand, you would have been confronted with that stupid motion that you wrote setting out the other deaths that you were responsible for. You would have been confronted with the letter that you wrote to Jackie Leggett telling her what to testify to, telling her what lies to say on the stand. When she was not willing to, she got in touch with the prosecutor to give them your letter because she thought it was so outrageous.

"You would have been cross-examined and with all of those other things that you have written in a variety of contexts; when you came back and asked us to allow you to change your mind, when your document, your *Marsden* motion had already been, at your request, submitted to [the prosecutor] so that I can consider it with respect to the [section] 1118 motion. You would be cross-examined with that and impeached with that.

"Then if I let you now, you would be impeached with this document that you just wrote.

"You are on a suicide mission and telling me that you just want to walk back there and sit back there with the wires hooked up, is telling me 'just another little step on my suicide mission'—"

In light of the foregoing, and the presumption of sound trial tactics which attaches to counsel's decisions (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694-695, 104 S.Ct. 2052]), Klvana's assertion must be rejected.

*Failure to Object*

 Klvana complains that his counsel was ineffective for failing to object to the testimony of Dr. Oakes and the prosecutor's comment on Klvana's failure to call his own expert witness to testify. In assessing this assertion, it must be borne in mind that a failure to object to evidence or argument is rarely sufficient to establish incompetence (*People* v. *Frierson* (1991) 53 Cal.3d 730, 747 [280 Cal.Rptr. 440, 808 P.2d 1197]), and appellate courts should be reluctant to invoke judicial hindsight since trial counsel was in a better position to evaluate the jury's reaction to the proceedings. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Kelley* (1990) 220 Cal.App.3d 1358, 1373 [269 Cal.Rptr. 900].)

a. *Dr. Oakes's Testimony*

As part of his direct examination by the prosecutor, Dr. Oakes testified that "as early as Dr. Klvana's residency, he was notified that he had difficulty in judgment-making, particularly regarding the management of obstetric patients"; the alteration, destruction, or fabrication of medical charts implies "that one has knowledge about the impropriety"; the Loma Linda information gave Klvana the knowledge "that his management practices endanger[ed] lives"; Klvana did not change his practices when confronted by Loma Linda with the deficiencies in his medical judgment; he "would have expected Dr. Klvana to recognize that his medical judgment was not up to par"; and, in response to the question, "Doctor, in your opinion, does Dr. Klvana demonstrate by his actions a total and conscious disregard for the well-being of others who are under his management,"[27] he testified he "believe[d] that Dr. Klvana demonstrates a pattern of the disregard for the risks associated with these complications of pregnancy that we

---

[27]Defense counsel's objection to this question as calling for a legal conclusion was overruled.

have discussed," and he found "it impossible to believe that [Klvana] isn't aware of it."

Klvana asserts that his counsel should have objected to Dr. Oakes's testimony on the "ultimate issue" of his subjective awareness because (i) Dr. Oakes was not qualified as a psychiatric expert and (ii) section 29 prohibits expert testimony on the defendant's mental state during the guilt phase of a trial.

The flaw in this assertion is that Dr. Oakes was not testifying as a psychiatric expert on Klvana's "mental illness, mental disorder, or mental defect." Rather, he was testifying, as a medical expert, on the prevailing standards of obstetrical care and what knowledge a person with Klvana's medical training and experiences would be expected to possess. This testimony in no way removed the ultimate issue of subjective awareness from the trier of fact.

However, even if an objection should have been made and sustained, Klvana has failed to demonstrate that a different result would have occurred had this testimony not been admitted. (*People* v. *Frierson, supra,* 53 Cal.3d at p. 747.) The jury was presented with overwhelming evidence from which it could infer that Klvana was subjectively aware his methods of delivery were life-endangering.

b. *The Prosecutor's Comment*

In his closing argument, the prosecutor stated:

"I think it is worth keeping in mind the law talks about implied malice, that the person must have subjective awareness of the dangers, the risk, that is, they must know.

"The law does not require that they accept that knowledge, because if you accept the knowledge, the law presumes that you will not do these dangerous things. The law holds you accountable when you know and you simply decide to act in total disregard of that knowledge for your own benefit.

"Dr. Klvana, if he suffered from some kind of mental disease, defect or disorder—I mean, it may cross your mind, you may be saying, 'Gee, maybe there is just something wrong with this man phychiatrically [*sic*], psychologically, something of a mental disorder that is a short circuit in his mind that prevents him from actually taking in this knowledge that he has been given from the days at Downstate, all the way through these experiences.'

And it's almost as if he can't hear; that he's unable to have the words go in the brain and be stored in the brain.

"Ladies and gentlemen, these are competent defense lawyers, I have told you from the beginning, and they have access through the court to have Dr. Klvana examined by forensic psychiatrists and psychologists. It happens all the time.

"If there were any basis, any medical basis to demonstrate that Dr. Klvana suffers from some kind of psychological or psychiatric condition which prevents that this information he is being bombarded with as to his dangerous care and practices, from being assimilated in his brain, you would have heard it, because this man is charged with murder and the key issue in this case is, is he able to have the subjective awareness.

"If you are going to call mothers, as the defense did, to talk about the things that we have already discussed, you know, calling women, as if you have had a doctor who could say that Dr. Klvana's care was appropriate, that if you had a doctor who could say Dr. Klvana does in fact have a medical problem or mental defect or disorder that precludes him from being aware of subjective awareness of the dangers, that doctor would have been on the stand. But what we do have is evidence from the prosecution that Dr. Klvana engages in a practice of deceit [sic], misrepresentation and dangerous medical practices that have resulted in the deaths of babies. And if you have doctors who can state otherwise, you call them, you don't call the mothers."

■ Klvana argues that the prosecutor engaged in misconduct since this type of evidence is inadmissible under sections 28 and 29, and his attorneys were incompetent for failing to object to this evidence. It is indeed ironic that Klvana would deem such evidence inadmissible when he asserts his counsel were incompetent for not investigating and introducing this very type of evidence.

Notwithstanding the Attorney General's concession that such evidence is inadmissible, it has been held that section 28 does not preclude the introduction of psychiatric evidence that a defendant was actually prevented from forming the requisite mental state due to a mental disease (*People* v. *Jackson* (1984) 152 Cal.App.3d 961, 968 [199 Cal.Rptr. 848]), and section 29 "does not forbid an expert from stating his opinion about the accused's mental state [but] only from testifying whether [the] defendant had one of the mental states required for the offenses." (*People* v. *McCowan* (1986) 182 Cal.App.3d 1, 14 [227 Cal.Rptr. 23]; see also *People* v. *Molina* (1988) 202 Cal.App.3d 1168, 1173 [249 Cal.Rptr. 273]; *People* v. *Whitler* (1985) 171 Cal.App.3d 337, 340-342 [214 Cal.Rptr. 610].)

Finally, the jury was instructed that the comments of counsel were not to be considered as evidence. (CALJIC No. 1.02.) It is presumed that the jury properly followed this instruction. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].)

*Deficient Closing Argument*

 Klvana quotes various portions from his counsel's closing argument and complains that his attorneys inappropriately conceded his negligence, guilt of manslaughter, and dishonesty. Klvana argues that these concessions, coupled with his attorneys' speculation of what should have been obvious to Klvana, highlight the necessity of producing a psychiatric defense and Klvana's testimony. The latter two topics have been adequately discussed and refuted, *ante.*

With regard to the concessions in closing argument, it is extremely clear that, as a tactical choice, Klvana's counsel were hoping to convince the jury that Klvana was not subjectively aware that his methods of delivery were life-endangering, and therefore he could only be guilty of involuntary manslaughter. "It is within the permissible range of tactics for defense counsel to candidly recognize the weaknesses in the defense in closing argument. [Citations.]" (*People* v. *Jones* (1991) 53 Cal.3d 1115, 1150 [282 Cal.Rptr. 465, 811 P.2d 757].)

*Other Omissions*

Klvana refers to numerous items not as "failures which individually constitute instances of reversible incompetence, [but instead] as additional evidence supporting [his] claim defense counsel effectively abandoned his defense and thus provided constitutionally ineffective assistance." In light of the scope of these items, our discussion of each one will be brief.

a. *Section 871.5*

Following the presentation of the evidence at the preliminary hearing, the magistrate concluded that the evidence only demonstrated gross negligence in the murder counts relating to Johnson and Ginsberg, and dismissed these counts. The People filed a motion pursuant to section 871.5 in the superior court. The trial court concluded "that the legal standard that was applied by the [magistrate] was such that it was inappropriate for him to have reduced those counts to the involuntary manslaughter," and granted the People's motion to reinstate the two murder counts.

In his petition for a writ of habeas corpus, Klvana faults his trial counsel for failing to seek a writ of prohibition in the appellate court on these two

counts. However, such a writ had to have been filed within 15 days of the trial court's order. (§ 999a; see *People* v. *Laiwa* (1983) 34 Cal.3d 711, 720, fn. 3 [195 Cal.Rptr. 503, 669 P.2d 1278].) At the time of the trial court's order, and for the 15-day period thereafter, Klvana was in propria persona.[28]

### b. *Bad Character Evidence*

Klvana asserts his counsel should have objected on the basis of relevance to the introduction of evidence concerning the discipline meted out by BMQA for dispensing controlled substances without a good faith examination. Contrary to Klvana's assertion, this evidence was necessary to explain the significance of Klvana's subsequent misrepresentations of his probationary status when he applied for privileges at various hospitals, which itself was clearly relevant to Klvana's subjective awareness.

### c. *Uncharged Deliveries*

Klvana argues the evidence of the Noel and DeGennaro deliveries should have been objected to as irrelevant to the charged homicides. However, the circumstances of the Noel delivery were relevant insofar as they demonstrated that Klvana had been exposed to the proper procedure of utilizing an electronic fetal monitor while administering Pitocin, and the need, in appropriate cases, to deliver via Cesarean section. Similarly, the DeGennaro delivery exposed Klvana to the dangers evidenced by meconium staining and to the proper use of a fetal monitor.

### d. *Improper Expert Testimony*

Klvana states his counsel should have objected to Dr. Feldman, the chair of Northridge's obstetrics and gynecology department, testifying that "an obstetrician who covered up mistakes by doctoring his chart [was not] a competent obstetrician" since Dr. Feldman was not qualified as an expert witness.

However, this question was posed on redirect examination, immediately following a cross-examination which concluded with the following favorable testimony:

"Q [by defense counsel:] How would you describe Dr. Klvana as a physician, as an obstetrician in deliveries? Would you have an opinion?

"A [by Dr. Feldman:] The one Cesarean section I recall assisting him with, he was technically competent, did a nice job."

---

[28]Klvana did, however, have advisory counsel.

It would have appeared silly for defense counsel to object to a natural follow-up question, especially since Dr. Feldman would have undoubtedly qualified as an expert witness.

e. *Evidence of Previous Acts of Negligence*

Klvana claims his counsel should have objected to evidence of his negligent acts at Downstate and Loma Linda pursuant to Evidence Code section 1104.[29] However, this evidence was not offered to prove that Klvana was negligent on the dates of the deliveries charged; rather, it was admitted to demonstrate that, given the warnings presented by these previous acts of negligence, and subsequent admonishments, Klvana necessarily was subjectively aware that he was engaging in life-endangering practices.

f. *"Did He Tell You?" Questions*

Klvana contends his counsel should have objected to questions posed by the prosecutor to various witnesses that took the form of "Did he tell you . . . ?" For example, the prosecutor asked Diederick, "Did [Dr. Klvana] ever say to you that he had Mrs. Doyle there as his eyes and ears, so to speak, to monitor the labor until he was going to get there?"

To the extent that the various questions were not admissible as admissions, these questions clearly did not affect the outcome of the trial since this information was introduced through other sources, and therefore counsel's failure to object was harmless. (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].)[30]

g. *Attorney-client Privilege*

Klvana faults his trial counsel for failing to invoke the attorney-client privilege when an "attorney" with whom Klvana had previously consulted was called to the stand. This assertion is completely meritless since Agnes

[29]Evidence Code section 1104 provides, in pertinent part, "evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

[30]Similarly, evidence concerning the scope of knowledge, procedures, and complications Klvana would be expected to have been exposed to during his Downstate residency; Klvana's ineligibility for privileges at Huntington due to his not being board eligible or certified; information contained in Doyle's application for an associate science nursing degree; information regarding items seized in a search of Doyle's residence; Klvana's testimony from the malpractice action; the distance between Klvana's residence and the various hospitals which had granted him staff privileges; and the various hospitals' administrative appeal procedures was either admissible or, if not, certainly did not have an impact on the outcome of the trial. (*Ibid.*)

Montalto testified that, at the time of her conversations with Klvana, she informed him that she was no longer licensed and did not practice law. For purposes of the attorney-client privilege, a lawyer is defined as· "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." (Evid. Code, § 950.)

### DISPOSITION

The judgment in B048085 is affirmed. The petition for a writ of habeas corpus (B065578) is denied.

Spencer, P. J., and Ortega, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 17, 1993.