Filed 12/16/22 P. v. Godoy CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060340 |
| v. | (Super. Ct. No. 17NF0979) |
| AUGUSTINE BRADY GODOY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

\*      \*      \*

A jury found appellant Augustine Brady Godoy guilty of second degree murder (Pen. Code, § 187. subd. (a))[1] and that he used a dangerous or deadly weapon in the commission of his crime (§ 12022, subd. (b)(1)). The trial evidence was undisputed Godoy had been drinking alcohol prior to the underlying incident where Godoy killed his friend by repeatedly striking his friend's head with a liquor bottle and knife.

During closing statements to the jury, the prosecutor argued Godoy should be convicted of first degree murder because he had acted with an intent to kill, but also argued in the alternative that Godoy should be convicted of second degree murder based on a theory of implied malice. The prosecutor analogized to hypothetical examples of dangerous conduct to support her argument for a finding under a theory of implied malice. Godoy's trial counsel did not object.

On appeal, Godoy argues the prosecutor's misstatement of law resulted in the jury not understanding California's legal requirement that a defendant had to deliberately act with conscious disregard for human life in order to be guilty of murder under an implied malice theory. Godoy asserts the trial court should have instructed sua sponte clarifying the legal requirement. Godoy also asserts his trial counsel rendered ineffective assistance by failing to request a pinpoint instruction and by not timely objecting to the prosecutor's misstatements on implied malice.

We assess Godoy's contentions within the context of the arguments made at trial and the entire set of jury instructions issued by the trial court. We conclude the court's written instruction on implied malice correctly stated the law and that Godoy has not shown a ground for reversal. We affirm the judgment.

---

[1]     All further undesignated statutory references are to the Penal Code.

FACTS

In 2015, law enforcement officers responded to Godoy's 911 emergency call alleging a physical altercation at the home of K.M. and his family. Godoy, 28 years old at the time of the incident, and K.M., 27 years old, had first become friends during childhood. At the time of the fatal incident, Godoy had been living in the garage of K.M.'s home.

First responders found Godoy with a severe cut to his arm and K.M. lying dead on the kitchen floor of the home. Godoy admitted he cut himself postincident, but also claimed K.M. had superficially cut Godoy's arm. During his 911 call, Godoy had told the operator that K.M. had been "on steroids," but none were later found in K.M.'s system. Godoy was later determined to have cannabinoids in his blood system associated with marijuana use and a blood alcohol concentration of 0.09 percent.

I. *Trial Evidence*

A. Incident

Godoy had a history of alcohol-related incidents leading up to the fatal 2015 incident involving K.M. Six years earlier, in 2009, Godoy was involved in a serious auto collision while driving under the influence, and struck a pole with his vehicle. He suffered significant injuries, including head trauma, and was in the ICU for eight days. In 2013, Godoy pleaded guilty to another drunk driving incident that resulted in an ignition interlock device being installed on his vehicle to prevent him from driving under the influence of alcohol.

The fatal incident occurred on a weekday afternoon, after K.M. returned home from work. Godoy had consumed alcohol throughout the day and at some point called K.M. several times while K.M. was at his work wanting to use K.M.'s family vehicle. There was evidence presented at trial that K.M. expressed frustration with Godoy over the phone. There was also evidence K.M. called Godoy's sister that

3

afternoon to discuss arrangements for Godoy's temporary housing (to accommodate K.M.'s visiting relative at his home) and that K.M. had been nice, calm, and had not sounded angry.

### B. Godoy's Trial Testimony

At trial, Godoy testified that after his 2009 auto accident, he engaged in programs to try and manage his alcohol consumption. Godoy testified that in 2015, after he left a sober living home, K.M. invited Godoy to live in K.M.'s furnished garage, rent free. Godoy began drinking soon after, and would also smoke marijuana outside of the residence.

K.M. arrived home and began yelling and cursing about Godoy being drunk. Godoy was shoved by K.M., who was "really mad," pulled out a knife, and threatened to kill Godoy. Although Godoy told K.M. to drop the knife and testified he was scared, Godoy followed K.M. into the kitchen where the situation escalated.

K.M. swung his knife which contacted Godoy's left arm. Godoy then grabbed a liquor bottle and struck K.M. in the head with it. K.M. fell to the floor and fumbled with his knife. Godoy believed K.M. was going to use the knife again, so Godoy picked up a different knife and hit the side of K.M.'s head with the butt of the knife.

Godoy struck K.M. multiple times with the butt of the knife, but could not recall whether he had done so more than three times and denied ever stabbing K.M. Godoy also struck K.M. with a liquor bottle more than once.

Godoy claimed he acted in self-defense and blamed K.M. for starting the altercation. Godoy stated he was overwhelmed with sadness and believing K.M. had not died, Godoy cut his own arm to commit suicide, as his "way of making it right" with K.M. Godoy also testified that after experiencing "really bad chills," he stepped into a

4

hot shower and dialed 911 for help. He told the operator K.M. was on steroids but it was stipulated at trial no steroids had been found in K.M.'s blood system.

C. Post Incident

When responding law enforcement officers arrived at the home, they located bottles of alcohol and six knives at the scene. According to the pathologist who performed the autopsy, K.M. was found with multiple fractures on the front and back of his skull, and multiple stab wounds to his head, including a one and three-quarter inch incised wound beneath his right eye. The cause of death was determined to be blunt force trauma to the head. K.M.'s skull fractures had perforated his brain. The pathologist testified that a comminuted fracture at K.M.'s forehead had been caused by at least two blows similar force typical of motor vehicle accidents or falls from heights.

II. *Jury Instructions*

After the close of evidence, the trial court instructed the jury. The instructions discussed all four charges Godoy faced: first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter.

An instruction on second degree murder, based on CALCRIM No. 520, outlined the two alternative mental states required for second degree murder liability: express and implied malice. For the first ground, the instruction simply stated the jury could decide Godoy acted with express malice if the jury found Godoy had "unlawfully intended to kill" at the time he acted.

For the second ground, the CALCRIM No. 520 instruction set forth in relevant part that the jury could find Godoy had acted with "implied malice if: [¶] 1. He intentionally committed the act [that caused death]; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he

5

knew his act was dangerous to human life; AND [¶] 4. *He deliberately acted with conscious disregard for human life*." (Italics added.)

The set of instructions given to the jury did not contain any specific definition for the phrase "deliberately acted with conscious disregard for human life." (CALCRIM No. 520.) Indeed, a general instruction given, CALCRIM No. 200, stated in relevant part: "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I [the trial judge] give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

The concept of "conscious disregard for human life" was discussed in another jury instruction given by the trial court, CALCRIM No. 580, to contrast a lesser included offense of involuntary manslaughter from murder and voluntary manslaughter. That instruction stated in relevant part as follows: "The difference between other homicide offenses and involuntary manslaughter *depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk*. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, *and done in conscious disregard of that risk*, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill *and without conscious disregard of the risk to human life* is involuntary manslaughter." (Italics added.)

III. *Closing Arguments*

A. The Prosecutor's Statements

After instructions were given by the trial court, the parties presented their closing statements to the jury. The prosecutor used visual slides and argued Godoy should be convicted of first degree murder because he had acted with specific intent to

6

kill.  The prosecutor argued in the alternative that Godoy had, "at minimum," committed second degree implied malice murder.

The prosecutor discussed implied malice murder liability and asserted two hypothetical examples on the theory as follows:  "Implied malice is a killing that results from an intentional act.  The natural consequences of the act are dangerous to human life.  The dangerous act was deliberately performed with disregard for human life.  So an example of that might be a person dropping a bowling ball over the freeway onto the lanes of traffic.  They might not intend to kill anyone, but obviously that is such a dangerous act, and *such an obviously dangerous act*, that that would constitute implied malice.  It doesn't require an intent to kill.  If you swing a knife at someone, that could also constitute implied malice."  (Italics added.)[2]

The prosecutor continued her argument as follows:  "Implied malice murder does not require an intent to kill.  So this gives you a starting point for how to analyze the facts in this case.  If you believe that the defendant intended to strike [the victim] with multiple deadly weapons, knowing those weapons were dangerous to human life, and he did that with conscious disregard for human life, that means that he is liable of implied malice second-degree murder even without considering whether this defendant had the intent to kill.  Implied malice murder, second-degree murder, *just requires an intent to do the act, to strike [the victim] with the deadly weapon*.  [¶]  And the defendant himself admitted that he intended to strike [K.M.] with the [liquor] bottle, a large, heavy glass bottle.  He admitted he intended to do that, and he did that.  *So right out of the starting gate, when you're analyzing the facts in this case, you know that it's already at least an implied malice second-degree murder*."  (Italics added.)

---

[2]    All italicized quotations of closing statements reflect Godoy's emphasis in his appellate briefing.

The prosecutor argued more generally that the trial evidence contradicted Godoy's claimed chain of events — for example, that Godoy's own testimony showed he was trying to cover up the truth he had been angry at K.M. for not being able to use a family vehicle. The prosecutor asserted Godoy's voluntary intoxication could only be considered in a limited way and that the trial evidence did not support legal theories of self-defense or manslaughter.

Toward the end of her opening closing statements, the prosecutor returned to an earlier analogy for implied malice: "So going back to the bowling ball example. . . . We know this defendant is, at minimum, guilty of second-degree murder. We know that based on the evidence because, going back to that definition, implied malice murder requires no intent to kill. It applies when killing results from an intentional act, the natural consequences of the act are dangerous to human life, and the dangerous act was deliberately performed with disregard for human life.

"And, clearly, hitting someone over the head with a giant glass bottle repeatedly and stabbing them, those are intentional acts that everyone knows are dangerous to human life, and those were deliberately performed with disregard for human life. Those acts were way more personal, up close and personal, compared to dropping a bowling ball from a freeway. Because that would still be implied malice murder. You could drop a bowling ball over the freeway underpass and never even see a person down below and never even think there was someone down there, and yet you would be liable for second-degree malice murder if you did that and someone happened to drive under the spot where the bowling ball drops.

"And in this case, this was as up close and personal as it gets. This defendant was inches from [K.M.]'s face when he inflicted these injuries. And he knew, just like anyone would know, that these acts of hitting someone with multiple weapons, such as giant glass liquor bottles and stabbing someone with knives, that those demonstrate a disregard for human life. That's obvious." Although Godoy's trial

8

counsel objected at several points during the prosecutor's closing statements, counsel did not object to the above quoted arguments.

### B. Defense Closing Statements

Godoy's trial counsel discussed all four crimes Godoy was facing. Counsel argued Godoy was only guilty of a form of manslaughter and not murder and emphasized the chaotic and frantic nature of the events that unfolded.

Defense counsel discussed a jury instruction on mental impairment, contrasting the issue from voluntary intoxication. Counsel asserted that, in addition to being voluntarily intoxicated, Godoy had acted with a "broken brain" at the time of the fatal incident because he had sustained a traumatic brain injury in his 2009 auto collision incident. Counsel argued Godoy's expert witness had testified that Godoy had been "reacting to what he perceived to be a threat on his life" during the incident.

Counsel referred to Godoy's mental impairment as it applied to second degree murder as follows: "Implied malice was defined for you. An act the natural and probable consequences of which are dangerous to human life. When the person acted, he knew his actions were dangerous to human life. It doesn't apply here because we're in the -- we have a person who is acting in self-defense, who is not thinking about his actions. He is reacting." Counsel accurately and repeatedly emphasized it was the prosecutor's burden to prove beyond a reasonable doubt that Godoy had not been acting in self-defense.

### C. The Prosecutor's Rebuttal

In rebuttal, the prosecutor argued Godoy's version of events was inconsistent with the trial evidence and common sense, and that Godoy was refusing to take responsibility for his actions. The prosecutor reasserted Godoy was guilty of first

9

degree murder but that, in the alternative, second degree murder was "the minimum crime that happened here," arguing:

"If you can't agree on the first [jury verdict form], then you mark not guilty on the first-degree murder form and you move to second-degree murder. There is no issue as to whether this defendant is guilty on that charge." Defense counsel made an objection claiming improper argument which the trial court overruled.

The prosecutor continued: "As we said yesterday, second-degree implied-malice murder does not require intent to kill. That's in the instruction. *It only requires an intentional act.* Even by the defendant's own account, he's guilty under this theory because he intentionally hit [K.M.] in the head with a glass bottle. We know from scientific evidence from [the pathologist and a forensic analyst who testified at trial], that at least two blows to the head, the defendant inflicted at least two blows to the head after [K.M.] was on the ground, after. [¶] *Everybody, including this defendant, knows that it is dangerous to human life to hit someone with a glass bottle over the head with force from close range as you'd have to with a bottle.* You'd have to be close. This crime was up close and personal. This defendant looked into the eyes of his best and only friend and beat him to death." (Italics added.) Godoy's trial counsel did not object to the statements.

The prosecutor responded to Godoy's closing argument as follows: "This was not a manslaughter, ladies and gentlemen. This was a murder. This defendant has made a lot of terrible decisions, but they were his decisions and they were calculated decisions. This is the time and this is the place where he has to own them. He doesn't deserve a break. His excuses don't fly. His broken brain, his intoxication, that doesn't match the evidence or the law, so I'd ask you to hold him fully responsible. Those were his choices. Those were his actions."

10

IV. *The Jury's Deliberations and Verdicts*

The trial court gave some final deliberation instructions to the jury, including how to communicate with the court during deliberations. Over the course of three days, the jury made three requests to the court relevant to this appeal: (1) for extra copies of jury instructions; (2) for equipment to view the photographic trial evidence; and (3) for copies of the pathologist's autopsy report and testimony.

On the third day of deliberations, the jury reached its final decisions and submitted to the trial court two verdict forms, finding Godoy not guilty of first degree murder and guilty of second degree murder. As noted, the jury also found true that Godoy had used a deadly weapon during the commission of the crime. The trial court sentenced Godoy to 16 years to life.

## DISCUSSION

I. *Appellate Contentions*

Godoy raises four claims on appeal. First, he contends the prosecutor committed prosecutorial error by presenting the jury with an invalid theory of second degree murder because the prosecutor in effect represented the jury could disregard the implied malice element of "deliberately act[ing] with conscious disregard for human life." Second, Godoy contends in the alternative that the prosecutor's closing statements additionally misrepresented the nature of implied malice liability by inviting the jury to make its finding about "conscious disregard for human life" under an objective rather than subjective standard. Third, Godoy contends the "the trial court had a sua sponte duty to instruct the jury that an intentional assault with a deadly weapon does not per se constitute implied malice." Fourth, Godoy contends his trial counsel rendered ineffective assistance of counsel by not requesting the instruction sought in Godoy's third appellate claim and also by not objecting to the prosecutor's closing statement arguments on implied malice murder liability. Given the nature of Godoy's appellate contentions and

11

their relationship to his "substantial rights" to a fair trial, we do not conclude his first and second appellate claims were forfeited. (§ 1259; see *People v. Vang* (2022) 82 Cal.App.5th 64, 80, fn. 4.)

II. *Standards of Review and Relevant Principles*

We independently review Godoy's claim of prosecutorial error (*Lafrenz v. Stoddard* (1942) 50 Cal.App.2d 1, 9.) "Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required. [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation.], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.] [¶] . . . we assess each claim of error on a case-by-case basis." (*Centeno, supra*, 60 Cal.4th at p. 667.) Critical to our disposition here, ""'[w]e presume the jury treat[ed] the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."'" (*Id.* at p. 676.) "'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former.'" (*Ibid.*; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433 ["'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions'"].)

12

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

III. *Relevant Law*

A finding of implied malice under a theory of second degree murder requires a factual finding that the defendant "deliberately acted with conscious disregard for human life" (see CALCRIM No. 520; accord, *People v. Dellinger* (1989) 49 Cal.3d 1212), meaning "the act which resulted in death [was] '"performed by a person who k[new] that his conduct endanger[ed] the life of another and who act[ed] with conscious disregard for life" [citation].'" (*People v. Bryant* (2013) 56 Cal.4th 959, 968.) The finding requires "a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*People v. Watson* (1981) 30 Cal.3d 290, 296-297; compare *People v. Bryant, supra*, 56 Cal.4th at p. 965 [under subjective standard, the ""mental component [of implied malice murder liability] is the requirement that the defendant [actually] 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life'""] with *Walker v. Superior Court* (1988) 47 Cal.3d 112, 136-137 [under objective standard used for theories such as criminal negligence, if "'a reasonable person in defendant's position would have been aware of the risk involved' . . . the 'defendant is presumed to have had such an awareness'"].)

13

IV. *Analysis*

Godoy criticizes the prosecutor's closing statements to the jury as follows: "the prosecutor argued that implied malice was established by committing an assault because an assault is dangerous under an objective standard. This argument bootstrapped assault into murder by ignoring the subjective requirement that appellant not only knew his conduct posed a deadly risk but also *consciously* disregarded the potential outcome of his act." Godoy's fundamental premise is that the jury was invited to ignore its duty to decide whether Godoy actually disregarded the danger to K.M.'s life. We assess the premise within the context of all arguments made at trial and the entire set of jury instructions issued by the trial court.

We first note the court's written instruction on implied malice correctly stated the law. Further, contrary to Godoy's claim that the prosecutor's rebuttal closing statements were the last words the jury heard on implied malice, the record is clear that the trial court's written instructions were what the jury last received because, as noted, the jury specifically requested copies of the instructions during its deliberations.

The copies provided included CALCRIM No. 200, quoted ante, which stated at a different point in the instruction as follows: "You must follow the law as I [the trial judge] explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The instruction reinforces our presumption the jury ""treat[ed] the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."" (*Centeno, supra*, 60 Cal.4th at p. 676 ["'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former'"].)

Next, we note the instructions given to the jury made it sufficiently clear Godoy's mental state was the central factual issue to be decided for all four of the crimes he was facing. Both the parties' trial arguments as well as the jury's verdicts reflected

14

this focus. For example, the jury's verdict acquitting Godoy of first degree murder (in the context of finding Godoy committed second degree murder) reflects the jury's deliberation on whether Godoy had "acted willfully, deliberately, and with premeditation" when he killed K.M. (CALCRIM No. 521.) The jury was necessarily asked to decide, for all possible outcomes, what Godoy's mental state had been when he engaged in the acts that resulted in K.M.'s death. This focus made it less likely the jury would misunderstand the trial court's correct instruction on implied malice murder liability.

Next, reinforcing the jury's correct understanding of its deliberation parameters for Godoy's mental state is the trial court's instruction given on involuntary manslaughter, which highlighted the concept of "conscious disregard for human life." As quoted ante, CALCRIM No. 580 was given to define the elements of involuntary manslaughter and did so primarily by contrasting that crime from murder and voluntary manslaughter. That instruction cross-referenced the difference between the crimes by highlighting the concept Godoy claims the jury was led to misunderstand. Its language further undermines the likelihood that the jury misunderstood the concept of consciously disregarding risk to human life as it related to implied malice murder liability.

We agree there is inaccuracy in some of the prosecutor's closing statements about implied malice when read in isolation. For example, as quoted ante, the prosecutor argued in her rebuttal closing statements as follows: "second-degree implied-malice murder does not require intent to kill. That's in the instruction. *It only requires an intentional act.*" (Italics added.) This statement ignores the mental component of implied malice murder liability. (*People v. Bryant, supra*, 56 Cal.4th at p. 965.)

Notwithstanding, we are not persuaded that Godoy's challenges to the statements made during closing argument demonstrate "'a reasonable likelihood the jury understood or applied the complained-of comments [by the prosecutor] in an improper or erroneous manner,'" given the context of the whole arguments made at trial and the entire

15

set of jury instructions issued by the trial court. (*Centeno, supra*, 60 Cal.4th at p. 667.) In particular, given the combination of jury instructions based on CALCRIM Nos. 200, 520, and 580, we do not discern a reasonable likelihood the jury received the prosecutor's closing statements as arguing that the jury could either ignore the correct written instruction on the required elements of implied malice murder liability or misunderstand the element of deliberately acting "with conscious disregard for human life" as meaning it could be satisfied under a reasonable person viewpoint instead of Godoy's actual state of mind.

## V. *Godoy's Contentions Are Unpersuasive*

Given our conclusion on the correctness of the trial court's jury instructions, we are not persuaded by Godoy's contentions for reversal. Godoy fails to present any case law that disputes the legal sufficiency of the CALCRIM No. 520 instruction given in this case. Further, his discussion of case law does not persuade us that the prosecutor's closing statements here amounted to error sufficient to justify a conclusion that the jury misunderstood its decisionmaking parameters for implied malice murder liability.

For example, Godoy heavily relies on *People v. Stutelberg* (2018) 29 Cal.App.5th 314 to assert that "[a]n instruction is erroneous if it allows the jury to find an element is proved based on a legally impermissible theory." We take no issue with the assertion as a general proposition but note *Stutelberg* is analytically unpersuasive here because that case involved an erroneous statement of law contained in the *jury instructions* (*id.* at p. 317 ["'inherently deadly'" basis for finding a "deadly weapon" was not available for box cutters as a matter of law]), whereas we have concluded the instructions given in this case correctly stated the law. In a similar vein, we are not persuaded by Godoy's reliance on another case, *People v. Medellin* (2020) 45 Cal.App.5th 519, because that case involved an ambiguity in a CALCRIM instruction

16

not at issue here (*id.* at pp. 533-536 [word "'or'" in jury instructions defining great bodily injury as "'greater than minor or moderate harm'" created ambiguity]) and the instructions here contain no analogous ambiguity.

Next, Godoy contends the trial court's version of CALCRIM No. 580 given to the jury, on involuntary manslaughter, "further exacerbated the invalid theory" presented by the prosecutor during closing statements. Godoy correctly notes the version given did not include language from the generic version of the instruction that expounded on the concept of criminal negligence, an issue assessed based on an objective rather than subjective standard. (See *People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704 ["'An essential distinction between second degree murder based on implied malice and involuntary manslaughter based on criminal negligence, is that in the former the defendant subjectively realized the risk to human life created by his conduct, whereas in the latter the defendant's conduct objectively endangered life, but he did not subjectively realize the risk'"].) Godoy reasons that the "omitted portion of the instruction could have clarified that wh[ich] elevates the crime from manslaughter to implied malice murder is the conscious disregard for life, not the objective dangerousness of the act."

Although we generally agree the omitted language in the involuntary manslaughter instruction given could have provided more clarity if included, the point is of no moment for this appeal because the language that *was* included on involuntary manslaughter was sufficiently clear to properly instruct the jury, given the context of this case. We note the given instruction ended with the following correct statement of the law: "In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill *or with conscious disregard for human life*. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter." (Italics added.)

17

Based on the record, notwithstanding omitted language that could have provided further clarity, the instruction given on involuntary manslaughter reinforced a correct understanding that implied malice murder liability required the jury to find Godoy had "*actually appreciated* the risk involved" and then consciously disregarded it when he engaged in the acts that resulted in K.M.'s death. (*Watson, supra*, 30 Cal.3d at pp. 296-297.) Accordingly, Godoy's criticism of the involuntary manslaughter instruction given amounts to an observation it could have been better, whereas our review of this appeal is focused on whether the jury instructions as a whole were legally sufficient, not perfect, to support an accurate verdict. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

In the same vein, we are not persuaded by Godoy's assertion that "the trial court had a sua sponte duty to instruct the jury that an intentional assault with a deadly weapon does not per se constitute implied malice." Generally, a court is required to instruct only on general principles that are necessary for the jury's understanding of the case; the court need not instruct, without request, on specific points or special theories that might be applicable to the particular case. (See *People v. Morse* (1964) 60 Cal.2d 631, 656 ["the court need not render particular instructions as to specific points unless the parties request them or they are essential to a fair trial"].) The court did not have the sua sponte duty Godoy asserts. To the extent Godoy seeks to assert that a pinpoint instruction should have been issued, his failure to request one in the trial court forfeited the issue for direct appellate review.

Finally, on Godoy's contentions that his trial counsel rendered constitutionally ineffective assistance, we note they all rest on a premise that absent the alleged ineffective assistance, the jury would have properly understood its decisionmaking parameters for implied malice murder liability. Given our conclusion there is not "'a reasonable likelihood'" a misunderstanding occurred (*Centeno, supra*,

18

60 Cal.4th at p. 667), it follows that Godoy's ineffective assistance of counsel claim rises and falls with that conclusion (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [a reviewing "'court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant'"]). Accordingly, any claim that Godoy's trial counsel failed to preserve an issue for our review does not provide a basis to conclude counsel provided ineffective assistance. (See *People v. Price* (1991) 1 Cal.4th 324, 440 [claim of ineffective assistance based on failure to make trial objections rejected because of defendant's failure to show reasonable probability "a more favorable determination would have resulted" absent the ineffective assistance].)

In sum, we conclude the court's written jury instructions bearing on the issue of implied malice murder liability correctly stated the law and that Godoy has not shown a ground to reverse the trial court's judgment based on the jury's rendered verdicts.

## DISPOSITION

The judgment is affirmed.


MARKS, J.*

WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19