Filed 7/17/24  P. v. Guillen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062476 |
| v. | (Super. Ct. No. 06CF3677) |
| MIGUEL ANGEL GUILLEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

Miguel Angel Guillen appeals from the trial court's postjudgment order denying his petition for resentencing pursuant to Penal Code section 1170.95.[1]  Guillen argues insufficient evidence supports his conviction for second degree murder under an implied malice theory.  We disagree and affirm the postjudgment order.

FACTS

 A complete recitation of the facts can be found in our prior opinion *People v. Guillen* (2014) 227 Cal.App.4th 934 (*Guillen*).

Suffice it to say, John Derek Chamberlain was arrested for possession of child pornography and was housed in Theo Lacy Jail; Guillen was also a resident of the jail.  Chamberlain and Guillen were housed in F Barracks West (F West).

In the center of F Barracks, bisecting F West and F Barracks East, was an enclosed guard station.  F West had dormitory cubes lettered A through H.  The dormitory cubes had four-foot privacy walls.  Because of the design of the dormitory cubes, there were spots not visible from the guard station.  One of the blind spots was on the east side of D cube.  At the time, F Barracks was supervised by two deputy sheriffs and a sheriff special officer.  F West had a dayroom where during the designated time 146 inmates could roam.

Inmates at the jail formed race-based groups called "CARs," Classification According to Race.  In F West, there were three CARs:  the

---

[1]　　　Effective June 30, 2022, the Legislature renumbered Penal Code section 1170.95 to section 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  For purposes of clarity, we refer to the statute as section 1172.6 throughout the opinion.  All further statutory references are to the Penal Code.

Woods (Caucasians), the Paisanos (Mexican nationals), and the South-Siders (Hispanic Americans). Each CAR had a leader, a "shot caller," a second in command, a "right-hand man," an enforcer, a "torpedo," and a person waiting in command, a "mouse." There was also a "house mouse" for the entire barracks who was in charge of cleaning the barracks, distributing commissary slips, and communicating with the deputies about the barracks' needs. Inmates were aware of who occupied the roles and when a change occurred after someone left the barracks.

The shot caller and the right-hand man were responsible for determining which inmates were disciplined or "taxed." A common form of taxing was "the wall," where two inmates held an inmate against a wall for a specified period of time and hit him below the neck and above the waist. The shot caller authorized the taxing of inmates who did not follow jail rules or inmate rules. The shot callers used torpedoes to carry out the taxings. It was common for inmates to assault other inmates with "sensitive charges" such as child molesters (called "Chesters") and informants. All the CARs viewed the assault of inmates perceived to be child molesters or informants favorably.

At the time, Jared Petrovich was the shot caller, Garrett Aguilar was the right-hand man and torpedo, and Stephen Carlstrom was the mouse for the Woods. For the Paisanos, Raul Villafana was the shot caller, Salvador Garcia was the right-hand man, and Guillen was the mouse. Deputy Kevin Taylor, Deputy Jason Chapluk, and a sheriff special officer were assigned to F Barracks. Taylor was in command of F Barracks.

The Orange County Sheriff's Department (OCSD) did not condone deputies utilizing the CAR system but because of the number of inmates, deputies used the shot callers to control the inmates. Taylor met

3

with the shot callers almost daily and used them to control the barracks, discuss issues, and obtain information. In turn, deputies rewarded the shot callers. Deputies knew a shot caller would tax an inmate for violating the rules.

There was evidence that OCSD personnel told Petrovich that Chamberlain was a child molester and to assault him. Because the South-Siders ran F Barracks, Petrovich had to get its shot-caller's permission to tax Chamberlain and to show respect. Petrovich told the South-Siders shot-caller "Stretch" that Chamberlain was a child molester and to "do whatever." Stretch thanked Petrovich for letting him know. Petrovich returned to his cube and told everyone that Chamberlain was a child molester.

Later that day, during evening day room time, Aguilar entered D cube and told Andrew Corral, a South-Sider, to leave because they had business to conduct. Corral moved to the other side of D cube. Corral overheard Petrovich tell Aguilar they were going to beat a "'Chester'" who admitted he likes them young, and Aguilar left D cube. Petrovich, the Woods shot caller, remained in D cube, while Villafana, the Paisanos shot caller, and "Stretch," the South-Siders shot caller arrived in D cube. Corral heard them say they were going to beat and rape Chamberlain.

Aguilar went upstairs to J cube to bring Chamberlain to D cube. Aguilar escorted Chamberlain to D cube. As they entered D cube, Aguilar pushed Chamberlain to the floor and the attack began.

Multiple witnesses observed about four groups, totaling at least 30 inmates, enter D cube and assault Chamberlain for about 20 to 45 minutes. Corral, who was still in D cube, saw Aguilar hitting, kicking, and stomping Chamberlain. After Corral left D cube, he saw Aguilar repeatedly exit D cube, speak with Petrovich, and return to D cube.

4

Luis Palacios, a Paisanos, saw inmates going in and out of D cube, three or four groups of three or four inmates, taking turns hitting and kicking Chamberlain. Palacios saw Petrovich hit Chamberlain first. Palacios saw Aguilar grab hold of a bunk, elevate himself about three feet, and stomp on Chamberlain. Aguilar also hit him. Palacios also saw Guillen enter D cube, get on his knees, and make a couple downward striking motions during the beginning or middle of the attack. Guillen was in D cube for at least two minutes.

Robert Mayfield witnessed four waves totaling at least 12 inmates assault Chamberlain; the first few waves each lasted a couple minutes but the last wave lasted a "ridiculous" amount of time. The first wave was the Woods. Aguilar struck downward with his fists and used the bunk for leverage as he stomped up and down on something behind a short wall. Aguilar and other inmates put rubber-soled jail shoes over their hands before hitting Chamberlain. Carlstrom held onto the bunk while he violently jumped up and down on something behind the wall.

While waves of inmates hit, kicked, stomped, and did other abhorrent things to Chamberlain over the course of about 30 minutes, three OCSD personnel sat in the guard station approximately 68 feet away.

Eventually, Aguilar stood on a table and waved a white cloth to get the deputies' attention. Aguilar told deputies there was a man down in D cube and said, "'he told us his charges and it got out of hand.'"

Taylor and Chapluk entered D cube and found an unconscious Chamberlain. Deputies called for medical assistance and administered aid. When the paramedics took over, Chamberlain had no heart rate. Chamberlain was transported to the hospital where he was pronounced dead.

Chamberlain's cause of death was multiple severe blunt impacts leading to failed chest mechanism, asphyxia, and cardiac arrest. Nearly every region of Chamberlain's body had blunt force trauma injuries. Chamberlain had a total of 43 rib fractures and most of his ribs were severely misplaced; 21 of his 24 ribs were broken. His lung was punctured. Chamberlain's injuries could be equated with injuries suffered from a high-velocity car accident or a fall from multiple stories. Except for one rib fracture that caused a lung laceration, no single injury was fatal. Chamberlain would not have died without the head and rib injuries.

Investigators interviewed all 146 F West inmates that evening and the following morning, and some multiple times over the following weeks and months. Investigators interviewed 30 or more additional people, including over 20 OCSD personnel.

Over the course of a few interviews, Petrovich recounted how deputies told him Chamberlain was a child molester and to assault him. Petrovich essentially admitted he was the Woods shot caller, he orchestrated Chamberlain's taxing, and he knew inmates were going to savagely beat Chamberlain.

The day after the attack, investigators interviewed Guillen, who denied any knowledge of the incident or who was involved. Guillen said he was playing cards during the assault. He saw many people going in and out of D cube and heard noises, but he tried to stay away. He did not have any problems with Chamberlain and did not know who would want to hurt him. Chamberlain's blood was found on Guillen's left shoe. Guillen was released from custody in December 2006 and was deported to Mexico.

Over one year later, investigators interviewed Guillen while he was in custody at the City of Anaheim jail after advising him of his rights

6

pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.  Guillen said he was the Paisanos mouse.  Guillen was playing cards when he saw them coming downstairs and asked what was happening.  They said they were going to tax Chamberlain.  Guillen was told Chamberlain had raped or molested an eight-year-old girl and all Mexicans had to participate in his taxing.  Guillen agreed taxing was a common occurrence in jail and it usually consisted of "about 30 seconds, 30 blows on the body."  He said generally each race taxed their own race but with child molesters everyone participated in the taxing.

Guillen said he kicked Chamberlain once in the legs with his right foot.  He then removed his shoe and hit him three times on the stomach with his shoe.  Chamberlain was on his side, moving and screaming, when Guillen hit him.  Guillen said at least 30 inmates assaulted Chamberlain for about 15 minutes.

Guillen explained he had daughters and thought about if they were molested.  Guillen said he was afraid he would be taxed if he did not participate and it was difficult to understand if you were not in that position.  But he also admitted he had a choice whether to participate and he participated because he wanted to hit Chamberlain.  When an investigator asked whether he now knew what he did was wrong, Guillen replied, "'Always it's been wrong.  I always have known [it was] wrong.'"

A jury convicted Guillen and others of second degree murder of Chamberlain.  The trial court sentenced Guillen to 20 years to life in prison.  As to Guillen, we affirmed.  (*Guillen, supra,* 227 Cal.App.4th at pp. 1033-1034.)

Years later, Guillen filed a petition for resentencing pursuant to section 1172.6.  In its brief, the prosecution conceded Guillen made a prima

7

facie case for relief. The trial court appointed Guillen counsel and issued an order to show cause. The parties filed additional briefing.

At the evidentiary hearing, the trial court admitted the transcripts from Guillen's 2011 trial without objection. Guillen testified at the hearing.

Guillen admitted he was the Paisanos mouse. He stated that although he initially tried to ignore the taxing, he eventually entered D cube and saw Chamberlain, who was already hurt, lying on the ground. Guillen kicked Chamberlain once in the leg. Guillen put his shoe on his hand and "pretend[]" slapped Chamberlain with the shoe a few times on the stomach without trying to hurt him because he was screaming. Guillen left the cube and the taxing continued. He was not in the cube that long.

Guillen did not participate in planning the attack on Chamberlain's. He had to participate in the taxing because he was the Paisanos mouse and "it's a green light for the child molester, it's mandatory to go and participate" or he would be taxed. He never intended to kill Chamberlain and never thought he was going to die. He had witnessed many taxings and no one ever died—the purpose was to punish, not to kill. Guillen admitted no one forced him to participate and repeated that he thought about his daughters. He said there were other inmates who did not participate. He did not try to help Chamberlain.

After counsel argued, the trial court continued the matter to the following week. When proceedings resumed, the trial court denied Guillen's petition for resentencing because it was convinced beyond a reasonable doubt he was liable for implied malice murder. The court made its ruling without considering codefendants' statements.

The trial court relied on the fact that it was a widespread, brutal, and sustained beating that resulted in horrific injuries to his torso in particular. The court stated Guillen was the Paisanos mouse who had a choice whether to participate and he still decided to participate. The court found Guillen's claim he did not mean to hurt Chamberlain not credible. The court noted Guillen hit Chamberlain in the abdomen where there was no hemorrhaging but added "[T]he reality is all of that injury to his torso is what resulted in the fractures of those ribs and ultimately caused his death." The court reasoned that Guillen knew that this was not going to be an average taxing but that it would involve all the CARs.

Guillen's counsel asked the trial court what particular facts it had relied on to find Guillen's position as the Paisanos mouse promoted others to participate. The court explained Guillen was in a leadership position and when he chose to participate "he had the intent to aid and abet everyone else who was participating, and he was continuing to promote that."

Guillen's counsel asked the trial court whether the record included any facts that Guillen was in D cube for two minutes. The court explained it accepted that Guillen was in Cube D "for a few minutes" and "possibly only two" but that was sufficient based on evidence of his intent and knowledge.

DISCUSSION

Guillen argues insufficient evidence supports his conviction for implied malice murder. Not so.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "The primary difference between express malice and implied malice is . . . the former requires an intent to kill but the latter does not.

9

[Citation.]" (*People v. Soto* (2018) 4 Cal.5th 968, 976.)  Implied malice murder instead requires the killing be proximately caused by an act, """the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.""" [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)  Proximate causation requires the act to have been a substantial factor contributing to the death.  (*Ibid.*)  And conscious disregard for human life refers to a state of mind in which the person knows the conduct is dangerous to others but does not care if someone is hurt or killed.  (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)

The guilt of an aider and abettor to a crime is based on the direct perpetrator's acts and the aider and abettor's own acts and own mental state.  (*Reyes, supra*, 14 Cal.5th at p. 991.)  Accordingly, a direct aider and abettor of implied malice murder must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and the aider and abettor must act in conscious disregard for human life.  (*Ibid.*)  Implied malice thus includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for that objective danger.  (*People v. Knoller* (2007) 41 Cal.4th 139, 153-154, 157 (*Knoller*).)

In *Reyes*, our California Supreme Court clarified the type of act committed by an aider and abettor that is dangerous to human life for the purposes of implied malice murder.  An act that merely creates a dangerous situation in which death is possible, depending on how circumstances

10

unfolded, standing alone will not satisfy the proximate causation requirement of implied malice murder. (*Reyes, supra*, 14 Cal.5th at p. 989.) Rather, implied malice murder requires a high degree of probability death will result; the danger to life cannot be merely vague or speculative. (*Ibid.*)

Generally, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. (*Reyes, supra*, 14 Cal.5th at p. 988.) Under this standard, we review the record "'""in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" [Citations.]" (*Ibid.*) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Reviewing the entire record in the light most favorable to the judgment, we conclude substantial evidence supports the trial court's finding Guillen directly aided and abetted second degree implied malice murder.

With respect to the objective element, there was substantial evidence Guillen's acts involved a high degree of probability that they would result in death. (*Reyes, supra*, 14 Cal.5th at p. 989.) Although Guillen minimizes his conduct and provides justifications for his actions, Guillen admitted he had a choice whether to participate in taxing Chamberlain and he participated because he thought of his daughters and wanted to hit him. Repeated strikes to Chamberlain's torso during the 30-minute plus beating restricted his breathing and led to his death. Guillen said he entered D Cube and saw the bloodied Chamberlain lying on the floor. The evidence

11

established Guillen removed his shoe and hit Chamberlain three times in the stomach. Chamberlain was moving and screaming as Guillen hit him.

Guillen attempts to minimize his conduct by asserting he tried not to harm Chamberlain and was in D cube for a short amount of time. His participation may have been brief, but he willingly participated in a group beating and hit the bloodied and screaming Chamberlain in his torso. Guillen just needed to aid in a life endangering act, not be the direct cause of his death. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443 [defendant's presence at scene, participation in the attack, companionship with other perpetrators, conduct before and after the crimes, and motive of retaliation for disrespect all support finding that he aided and abetted an implied malice murder].)[2]

As for the subjective element, there was substantial evidence Guillen acted with an awareness he was endangering Chamberlain's life. (*Knoller, supra*, 41 Cal.4th at pp. 143, 153-156.) Contrary to Guillen's claim, his position as the Paisanos mouse, i.e., shot caller in waiting, supported the conclusion he was aware of and disregarded the danger to Chamberlain. Guillen was a member of the Paisanos' leadership structure and thus was intimately familiar with inmate culture. Guillen participated in the taxing because he was the Paisanos mouse and CAR rules required it. Guillen chose to participate.

---

[2]     Contrary to Guillen's claim, *People v. Schell, supra*, 84 Cal.App.5th 437, teaches that one does not have to instigate or plan the attack to be guilty under the theory of implied malice murder. He admits as much in his reply brief and his reliance on *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, where defendant instigated the attacked and encouraged a confederate's participation is misplaced.

12

The evidence demonstrated that as a member of the Paisanos' power structure, he was aware that as an alleged child molester, Chamberlain would not be subject to a normal taxing on the wall. Initially, Guillen denied being involved and claimed he had no problems with Chamberlain and did not know who would want to hurt him. Later, Guillen told investigators that everyone participated in taxing child molesters and he thought of his daughters before choosing to assault Chamberlain. Guillen's lies and his admission that he "always ha[d] known [it was] wrong" are evidence he was aware of and disregarded the danger to Chamberlain. (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704 [implied malice may be proved by circumstantial evidence].)

Guillen's admissions also belie his claim he had no reason to think that Chamberlain would be beaten to death because taxings occurred all the time and none resulted in death. Indeed, Chamberlain was lying on the ground bleeding before Guillen ever hit him. Guillen's claim that Chamberlain's taxing was business as usual was refuted by his own testimony. Guillen subjectively appreciated the risk of death to Chamberlain on account of the brutal circumstances of the group assault.

One cannot review this record and conclude the danger to Chamberlain's life was merely vague or speculative. The evidence established Guillen was aware of the danger posed to Chamberlain and that he acted in conscious disregard of the danger. He witnessed the brutality of Chamberlain's assault firsthand and chose to participate in the group assault by striking Chamberlain as he lay on the ground bloodied and screaming for help. Substantial evidence supports the trial court's finding that Guillen directly aided and abetted second degree implied malice murder and thus, the court properly denied his section 1172.6 petition.

13

## DISPOSITION

The postjudgment order is affirmed.


                                        O'LEARY, P. J.

WE CONCUR:


MOORE, J.


MOTOIKE, J.